In the Matter of the Application of NORMAN CAMPBELL and Others, Petitioners, against WILLIAM J. PICARD, Chairman, JOSEPH P. CRAUGH and Another, Constituting the Board of Standards and Appeals, Defendants.

Supreme Court, Special Term, Albany County, December 2, 1937.

*O'Connell & Aronowitz [George Myers of counsel], for the petitioners.*

*John J. Bennett, Jr., Attorney-General [Henry Epstein, Solicitor-General, F. R. Chant and Edward J. Gretchen of counsel], for the respondents.*

SCHENCK, J. This is an application for an order, under sections 1283 to 1306 of article 78 of the Civil Practice Act (added by Laws of 1937, chap. 526), to review a determination by the Board of Standards and Appeals in disapproving a proposed certificate of incorporation of " Empire Worsted Mills Shop Union Inc." An

application was made to the Board of Standards and Appeals in July, 1937, for the approval of the proposed certificate. The approval was opposed, and the Board of Standards and Appeals deferred action pending the outcome of the determination of the National Labor Relations Board whether the employer was coercing employees to form the union in question.

In October, 1937, an order was made requiring the Board of Standards and Appeals to act. Thereupon, the Board disapproved the certificate of incorporation. The Board held that there was evidence to indicate that the proposed shop union was approved by the employer and that its purpose was to prevent any national organization from soliciting membership of the employees of the Empire Worsted Mills, thus defeating the purposes of the National Labor Relations Act. The Board also held that independent unions whose membership is confined exclusively to the employees of a single employer, if not actually dominated in infancy by the employer, tend to eventually become controlled by the employer. There was evidence before the Board which would justify the inference that the employer was exercising coercion in the formation of the company union.

The question presented here is whether or not the Board of Standards and Appeals has the right and power to disapprove the certificate under the circumstances.

By chapter 820 of the Laws of 1937, section 9-a of the General Corporation Law was amended to read as follows:

" § 9-a. Certain corporations to have approval of State Board of Standards and Appeals. No certificate of incorporation of a proposed domestic corporation and no statement and designation of a foreign corporation having for its purpose the formation of an organization of groups of working men and women and wage earners having the name or names of ' labor,' ' organized labor,' ' federation of labor,' ' brotherhood of labor,' ' union labor,' ' union,' ' labor committee,' ' trade-union,' ' trades union,' ' union labor council,' ' building trades council or union,' ' allied printing trades council or union,' ' central labor body,' ' local union,' ' national union,' ' state union,' ' international union,' ' district labor council or union,' ' American Federation of Labor,' ' New York State Federation of Labor,' or the component parts thereof or the significant words therein, whether the same are used in juxtaposition or with inter-space shall be filed or recorded in any office for the purpose of affecting its incorporation, or of authorizing it to do business in this State, unless such certificate of incorporation or statement and designation shall be accompanied by an indorsement

thereon or annexed thereto with the approval of the Board of Standards and Appeals of the State of New York."

By the same chapter, subdivision 1-a of section 11 of the Membership Corporations Law was amended to read as follows:

" 1-a. If the certificate of incorporation specifies among the purposes, the organization of working men and women and wage earners for their mutual betterment, protection and advancement or for the regulation of hours of labor, working conditions and wages, the approval of the Board of Standards and Appeals of the State of New York shall be indorsed thereon or annexed thereto."

The matter chiefly in dispute on this application is the meaning of these amendments and to what extent powers are given to the Board of Standards and Appeals to approve or disapprove a certificate of incorporation of a labor union.

The legislation now on the statute books in connection with labor relations is the result of a long struggle between employer and employee, with the public at large often being inconvenienced and, in a few instances, endangered by strikes and industrial disputes.

It is an admitted fact that, from the standpoint of law, in the early history of labor organizations, the employers had the advantage. In England, as a result of the black death pestilence producing a scarcity of labor by the reduction of the population, unemployed labor was required by the Statute of Laborers to work for hire at recognized rates of pay. This was a maximum wage law. It was designed for the protection of the community, but it operated in favor of the employer. Combinations of laborers were held to be conspiracies. In this country injunctions were issued against strikes and picketing. In 1932, the Norris-LaGuardia Act limited Federal courts in the issuance of injunctions in labor disputes and declared the " yellow dog " type of contracts to be contrary to public policy. Before the end of 1935 sixteen States had enacted similar statutes. (Labor Laws of the United States of America, American Bar Assn. Journal, vol. 23, No. 10, Oct. 1937, p. 768; Labour Legislation, Encyc. Britannica, vol. 13, p. 537.)

The history of unions is that of a struggle between employer and employee, and without these contending and adverse factors the whole labor union movement would collapse. Modern legislation is designed to prevent the struggle whereby the employer would endeavor to annihilate the employees' union or the union to annihilate the employer. Not only the parties to such a struggle are vitally interested, but when these industrial disputes become widespread the public is seriously and adversely affected. In order to carry out the policy of modern labor legislation it is neces-

sary to maintain the solidarity of the employers on the one hand and the labor organization on the other so that there may be collective bargaining by employees.

Since the depression disputes between employers and employees have become acute. Strikes, lock-outs, boycotts and shut-downs have forced the public to take action in broadening and strengthening labor legislation.

In 1935 the National Labor Relations Act was passed by Congress (49 U. S. Stat. at Large, 449), and in 1937 the Legislature of this State enacted the New York State Labor Relations Act (Labor Law, art. 20, §§ 700-716, added by Laws of 1937, chap. 443).

A brief review of the provisions of the New York State Labor Relations Act indicates that one of the main purposes of the act is to keep employer and employee organizations separate and distinct, each free from domination by the other, so that there can be collective bargaining.

Section 700 of the New York State Labor Relations Act sets forth the policy of the act. It is stated that under prevailing economic conditions individual employees do not possess full freedom of association or actual liberty of contract; that in many instances employers have superior economic power in bargaining with employees; that the growing inequality of bargaining power substantially and adversely affects the general welfare of the State by creating variations and instability in competitive wage rates and working conditions; and that the denial by some employers of the right of employees to organize and the refusal by employers to accept the procedure of collective bargaining tend to lead to strikes, lockouts and other forms of strife; it is further stated that protection by law of the right of employees to organize and bargain collectively removes certain sources of industrial strife and unrest, and encourages practices fundamental to the friendly adjustment of industrial disputes; and that it is the public policy of the State to encourage the practice and procedure of collective bargaining.

It is provided in subdivision 6 of section 701 as follows: " The term ' company union ' means any committee, employee representation plan or association of employees which exist for the purpose, in whole or in part, of dealing with employers concerning grievances or terms and conditions of employment, which the employer has initiated or created or whose initiation or creation he has suggested, participated in or in the formulation of whose governing rules or policies or the conducting of whose management, operations or elections the employer participates in or supervises or which the employer maintains, finances, controls, dominates, or assists in maintaining or financing, whether by compensating

anyone for services performed in its behalf or by donating free service, equipment, materials, office or meeting space or anything else of value, or by any other means."

Sections 703 and 704 provide:

" § 703. Rights of employees. Employees shall have the right of self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in concerted activities, for the purpose of collective bargaining or other mutual aid or protection, free from interference, restraint, or coercion of employers.

" § 704. Unfair labor practices. It shall be an unfair labor practice for an employer:

" 1. To spy upon or keep under surveillance, whether directly or through agents or any other person, any activities of employees or their representatives in the exercise of the rights guaranteed by section seven hundred three. * * *

" 3. To dominate or interfere with the formation, existence or administration of any employee organization or association, agency or plan which exists in whole or in part for the purpose of dealing with employers concerning terms or conditions of employment, labor disputes or grievances, or to contribute financial or other support to any such organization, by any means, including but not limited to the following: (a) by participating or assisting in, supervising, controlling or dominating (1) the initiation or creation, of any such employee organization or association, agency, or plan, or (2) the meetings, management, operation, elections, formulation or amendment of constitution, rules or policies, of any such employee organization or association, agency or plan; (b) by urging the employees to join any such employee organization or association, agency or plan for the purpose of encouraging membership in the same; (c) by compensating any employee or individual for services performed in behalf of any such employee organization or association, agency or plan, or by donating free services, equipment, materials, office or meeting space or anything else of value for the use of any such employee organization, agency or plan; provided that, an employer shall not be prohibited from permitting employees to confer with him during working hours without loss of time or pay. * * *

" 5. To encourage membership in any company union or discourage membership in any labor organization, by discrimination in regard to hire or tenure or in any term or condition of employment. Provided that nothing in this article shall preclude an employer from making an agreement with a labor organization requiring as a condition of employment membership therein, if

such labor organization is the representative of employees as provided in section seven hundred five.

" 6. To refuse to bargain collectively with the representatives of employees, subject to the provisions of section seven hundred five. * * *

" 10. To do any acts, other than those already enumerated in this section, which interfere with, restrain or coerce employees in the exercise of the rights guaranteed by section seven hundred three."

By section 706 the Labor Relations Board is empowered and directed to prevent any employer from engaging in any unfair practices.

It seems that the whole policy of this statute, which is a part of the Labor Law, is to permit employees to organize and that that organization should be free from any coercion or domination by employers so that the organizations of employees may be able to bargain collectively in their own interest.

The Board of Standards and Appeals, to whom the duty of approving certificates of incorporation of labor unions is committed, has the general duty of carrying into effect the provisions of the Labor Law. (Labor Law, § 27-a, added by Laws of 1937, chap. 819.)

There is no express direction in the statute as to the various matters which the Board must consider in its determination to approve or disapprove.

However, the right of the Board of Standards and Appeals to approve or disapprove a certificate of incorporation of a labor union implies a duty to approve the formation of only such a union as will be consistent with public policy as indicated by the statute under which the union is to operate. The direction that the approval of the Board be obtained must be given a fair interpretation. It is only reasonable to assume that the Legislature intended, in the absence of any limiting provisions, that the approval should be given or withheld depending upon whether or not the association is one that is consistent in all respects with the Labor Law and the Labor Relations Act.

It is suggested that if there are any unfair labor practices in connection with the present company union they may be corrected by the Labor Relations Board after the formation of the corporation. While the Board has a right to cure evils as defined by the statute, it is more salutary that there be prevention rather than cure where that is practicable.

Provisions requiring the approval of certificates of incorporation are not new.

A provision somewhat similar to the one in question is contained in section 10 of the Membership Corporations Law.

In *Matter of German Jewish Children's Aid, Inc.* (151 Misc. 834), the court said: " The high sponsorship of this corporation and the personnel of the intended board of directors, on which are a judge of the Court of Appeals, a former justice of the Appellate Division, and a large number of persons well known in philanthropic activities, is a genuine guaranty of the sincerity of purpose. And the written approval on the certificate of incorporation of the State Board of Social Welfare under subdivision 1 of section 11 of the Membership Corporations Law gives assurance that further examination is unnecessary. It is, however, the duty of the justice to whom the approval of a certificate of a membership corporation is submitted, to determine whether the objects and purposes of the proposed corporation are in accord with public policy. (*Matter of Daughters of Israel Orphan Aid Society, Inc.*, 125 Misc. 217.) Worthy as they may be and high-minded as the sponsors behind it are, nevertheless, if public policy should not approve the exercise of the powers for which a grant is sought by a private corporation, it would be a subject of disapproval. (*Matter of Catalonian Nationalist Club*, 112 Misc. 207.) "

And in *Matter of Daughters of Israel Orphan Aid Society, Inc.* (125 Misc. 217), it was also said:

" Section 41 of the Membership Corporations Law (as amd. by Laws of 1924, chap. 519) requires such written approval of the certificate, indorsed thereupon, etc., before it is filed. This action cannot be deemed a determination that the mere formal requisites laid down by the Legislature have been fully met. Such matters of form are within the province of the Secretary of State, who as stated in *People ex rel. Woodward* v. *Rosendale* (5 Misc. 378; revd. on other grounds, 76 Hun, 103) has to determine whether the purposes of the proposed incorporation are within the statute and whether the articles are in proper legal form. It thus follows that even where the approval of the justice of the Supreme Court has been given, the Secretary of State may still refuse to file the certificate because of formal defects. (*People ex rel. Blossom* v. *Nelson* 46 N. Y. 477.) It seems to me, therefore, that the written approval referred to is in the nature of a finding that the objects and purposes of the proposed corporation are in accord with public policy, a determination that is more than ministerial and not a mere duplication of the function of the Secretary of State. This view is borne out by the opinion in *Matter of Agudath Hakehiloth* (18 Misc. 717), in which it was held that the question of approval is ' not to be determined arbitrarily or capriciously, but upon

reasons of public policy and by considerations of public interest.'
A similar interpretation of the function of the justice in such matters
is revealed in *Matter of Catalonian Nationalist Club* (112 Misc. 207),
in which approval was refused because the object of the corporation
seemed to tend toward perpetuating people in racial groups.   Fur-
thermore, the very fact that the clause requiring approval by such
judicial officer, is followed by a provision requiring similar action
by the State Board of Charities in the case of corporations organ-
ized for eleemosynary or philanthropic purposes, would indicate
that the required approval in both instances relates to content
rather than technical form.   This interpretation is strengthened
by the ruling in *People ex rel. Woodward* v. *Rosendale* (76 Hun,
103), in which the function of the Attorney-General in recommend-
ing to the Superintendent of Insurance the approval of an incorpora-
tion pursuant to section 10 of the Insurance Law was held to be a
judicial and not a ministerial exercise of power.   An interesting
sidelight upon this view is cast by the policy of our sister State of
Pennsylvania, the statutes of which (Act of April 29, 1874, Penn.
Laws of 1874, pp. 73, 75, No. 32) provide for approval by the
Court of Common Pleas of certificates of membership and kindred
corporations, with a special purpose of ascertaining that its objects
are lawful and not injurious to the community.   In commenting
on this, the highest court of that State in *Matter of Deutsch-Ameri-
kanischer Volksfest-Verein* (200 Penn. St. 143, 145) observed: ' The
court undoubtedly may and should look into the nature of the pro-
posed social enjoyment, to see that it is " lawful and not injurious
to the community " and may require specific statements and evi-
dence to that end.'

" The law, therefore, delegates to the justice the responsibility
of scanning the objects of the proposed membership corporation
in a manner beyond the mere formal review by the Secretary of
State."

In view of these decisions in analogous situations, and the other
considerations outlined above, I conclude that the application
should be denied.

Submit order accordingly.   No costs.