The FIRST NATIONAL BANK OF SIKE-
STON, MISSOURI, Plaintiff,

v.

JEFFERSON SALES AND DISTRIBU-
TORS, INC., et al., Defendants,

United States of America,
Interpleader,

Frank S. Blackford, Trustee, Triple M
Homes, Intervenor.

Civ. A. No. 3864.

United States District Court,
S. D. Mississippi, S. D.

Aug. 20, 1971.

**660**

T. H. Freeland, Oxford, Miss., David R. Smith, Poplarville, Miss., Charles G. Black, Michael Hartsfield, Memphis, Tenn., for plaintiff.

Jacob D. Guice, Biloxi, Miss., Frank Klein, Dalton Williams, New Orleans, La., for defendants.

Robert E. Hauberg, U. S. Atty., Joseph E. Brown, Jr., Asst. U. S. Atty., Jackson, Miss., for interpleader.

Dewayne N. Morris, Birmingham, Ala., for intervenor.

NIXON, District Judge.

On the night of August 17 and the early morning of August 18, 1969, the most intense storm ever recorded in the western hemisphere, Hurricane Camille, struck the Mississippi and Louisiana Gulf Coast with winds attaining a velocity approximating 200 miles per hour and tides ranging from 15 to 30 feet above normal. The obvious aftermath of this freak of nature which claimed many lives and totally destroyed over 4,000 homes on the Mississippi Gulf Coast alone, was the urgent necessity to find shelter for those persons the storm had rendered homeless. The transportation of hundreds of mobile homes into Mississippi and Louisiana during the following months provided a partial answer to this pressing need but was also the seed which gave birth to this lawsuit and its multiple ramifications.

The plaintiff herein, The First National Bank of Sikeston, Missouri, is a banking corporation organized under the National Banking Act, and is domiciled in Sikeston, Missouri. The defendant, Jefferson Sales and Distributors, Inc., is a corporation organized under the Laws of the State of Louisiana, having its principal place of business in the State of Louisiana. The defendants, Emergency Housing Authority, Pearl River Housing Authority, Pearl River Valley Opportunity, Inc., Lumberton Housing Authority, and Harrison County Housing Authority, are agents for various cities or counties within the State of Mississippi and have not answered nor made any appearance herein. Intervenor, Frank S. Blackford, is Trustee of Triple M Homes, Inc., an Alabama corporation adjudicated bankrupt on June 8, 1970 by the United States District Court for the Northern District of Alabama. The United States of America is a tax creditor of Triple M Homes.

Jefferson Sales and Distributors, Inc. was organized subsequent to the hurricane for the purpose of providing mobile homes to the Department of Housing and Urban Development (HUD) for rental through the above listed governmental bodies to the disaster victims. Pursuant to this arrangement, Jefferson Sales entered into two contracts with HUD, Contract No. H–1151 dated September 12, 1969, providing for the delivery of 100 units, and amended three times to provide for an additional 50 units, then one unit, then 25 units; and Contract No. H–1181 dated November 13, 1969, providing for the delivery of 125 mobile home units (Exhibits P–2, P–3). Both of these contracts were performed by Jefferson Sales and Distributors, Inc. in the Southern District of Mississippi. Jefferson Sales has been paid in full by the government for all of the mobile homes which are the subject of this lawsuit.

Pursuant to its first contract with HUD for the rental of mobile homes, Jefferson Sales entered into a verbal con-

tract shortly before September 19, 1970 with Triple M Homes, Inc., a Delaware corporation doing business in Haleyville, Alabama, whereby Triple M was to manufacture for Jefferson Sales 50 forty-foot long mobile homes at a price of $2,700 per unit. This order was confirmed by Jefferson Sales by a telegram dated September 19, 1969. (Plaintiff's Exhibit 1). Thereafter, Jefferson Sales and Triple M entered into three additional verbal contracts for 98 forty-foot mobile homes, the final contract having been negotiated on October 28, 1969. A total of 148 forty-foot mobile homes were delivered to Jefferson Sales by Triple M for a total contract price of $418,840, the last delivery date being November 10, 1969 (Exhibits 2–A–2–F, Complaint). It is admitted by the plaintiff bank that the defendant, Jefferson Sales, ultimately paid all but $39,544.76 of the amount due on this original series of contracts involving forty-foot mobile homes.

At approximately the same time that the initial agreement between Triple M and Jefferson Sales was executed, a bank account was opened at the First National Bank of Sikeston, Missouri, by Triple M through a Mrs. Owens, Assistant Vice-President of the bank, with the knowledge and consent of Mr. Donald R. Bohannon, President of the plaintiff bank during the period in question. Immediately upon the opening of this account, the bank obtained from Triple M Homes a resolution by its Board of Directors bearing the signatures of R. R. Buckley, Vice-President, Golden H. Lewis, General Office Manager, and Ann Rogers, Office Manager-Haleyville, and signed on behalf of the corporation by its Secretary Charles J. Ellis, Jr., on October 15, 1969. This document was retained by the bank in its Corporate Resolution Files along with the Corporate Signature Cards, and the bank has relied on the authenticity of this document in its various transactions, including the endorsement of drafts, with Triple M Homes.

Initially, there would seem to have been no clearly defined arrangement between Triple M and Jefferson Sales as to the method and time for payment, each party laboring under different understandings as to the procedure to be utilized. Triple M's first attempt to obtain payment from Jefferson Sales for mobile homes was commenced by the drawing of a draft in the amount of $101,540 payable through the International City Bank (I.C.B.) of New Orleans. Mr. Bohannon testified that this was the first draft the First National Bank had handled for Triple M under their arrangement with Jefferson Sales and therefore no immediate credit was given. The draft was sent directly for collection to I.C.B. in New Orleans, Louisiana to await payment thereof. This fact is evidenced by a letter addressed to Mr. Bill Ryan of I.C.B. from Bohannon stating that the draft together with some 25 Certificates of Origin were enclosed, and pursuant to instructions from Triple M, requesting that before delivery of any of the Certificates of Origin the total draft be paid. (Plaintiff's Exhibit 8; Tr. p. 16). Although this initial draft was not paid by Jefferson Sales through I.C.B., the matter was thereafter compromised as a result of a trip to New Orleans by R. R. Buckley, Vice-President of Triple M and Bill Bess, a banker and personal friend of Buckley, in a meeting with J. Marshall Brown and William E. Wonders, representatives of Jefferson Sales. Upon the payment of the sum of $65,000, this initial returned draft and attached certificates were released by the plaintiff bank on instructions of its customer, Triple M. (Tr. p. 17).

At the time of this meeting between representatives of Triple M and Jefferson Sales in early November, 1969, all 148 forty-foot trailers contracted for by Jefferson Sales under the first series of verbal contracts pursuant to its contract H–1151 with HUD had been delivered, and the only amount in controversy was the approximately $39,000 unpaid balance, alleged to be approximately $36,000 by the defendant Jefferson Sales. The witness, Wonders, testified that this amount had been withheld because of the financial condition of Triple M Homes at

that time and the delivery to Jefferson Sales of trailers with many defects and broken parts. Buckley testified that at this meeting Jefferson Sales agreed to pay the remaining $39,544.76 due on the first series of contracts on or before November 15, 1969.

This New Orleans meeting also resulted in an arrangement between Triple M and Jefferson Sales for payment under future contracts which was to be 75% of the purchase price, including freight, for the delivery of the units to Mississippi, and the remaining 25% on acceptance of the units by HUD. The payment was to be effectuated by Triple M issuing drafts through the plaintiff bank drawn on Jefferson Sales with invoices and Certificates of Origin attached thereto, to be sent to I.C.B. of New Orleans for collection.

On November 11 or 12, 1969, Jefferson Sales and Triple M entered into an oral contract for the sale of 76 mobile homes 44-feet long at a sale price of $2,700 per unit, and seven mobile homes 57-feet long at a sale price of $3,470 per unit. All units were to include a "living package" at $150 per unit. Payment for this second series of mobile homes, manufactured by Triple M and used by Jefferson Sales in performance of Contract No. H–1181, with HUD, was to be in conformance with the above new agreement made in New Orleans by representatives of Triple M and Jefferson Sales.

Pursuant to this agreement, Triple M executed a draft dated November 17, 1969, on Jefferson Sales for the sum of $73,012.50, this amount representing 75% of the sum due for mobile homes delivered by Triple M to Jefferson Sales (Exhibit P–6). This draft was endorsed by Triple M's Vice-President, R. R. Buckley and deposited for collection in Triple M's checking account with the plaintiff bank. Full and immediate credit was given Triple M by the plaintiff on this $73,012.50 draft, and the draft together with the invoices and Certificates of Origin attached thereto were sent for collection to I.C.B. under normal banking procedures. Mr. Charles Royal,

Vice-President and Cashier of the plaintiff bank, testified that prior to the transmittal of these drafts he had talked with Mr. Ryan of I.C.B. by phone and Ryan had stated that I.C.B. would honor the drafts because arrangements had been made. The witness further testified that although there was nothing in writing to verify this conversation the plaintiff bank would not have given immediate credit on the draft without assurances from the receiving bank that it would be honored. This draft was paid by Jefferson Sales through I.C.B.

Triple M executed a second draft on Jefferson Sales, dated November 17, 1969, in the amount of $31,837.50 (Exhibit P–7), and this draft was endorsed and deposited for collection in its checking acount with the plaintiff bank. Full and immediate credit was given to Triple M by the plaintiff. This draft was sent to I.C.B. of New Orleans for collection and paid by Jefferson Sales. Triple M withdrew all sums from its account represented by the $73,012.50 draft and $31,837.50 draft (Tr. pp. 19, 20; Exhibit T–10; Exhibit P–19).

On December 2, 1969, Triple M executed a draft on Jefferson Sales for $91,-460.50. This draft was prepared pursuant to an agreement reached between representatives of Triple M, the plaintiff bank and Jefferson Sales at a meeting held in New Orleans on November 30, 1969, and covered 75% of the sum due for 36 units manufactured by Triple M for Jefferson Sales and was evidenced by Certificates of Origin attached to the draft. It also included a part of the balance due on the original orders which at that time had not been paid. This draft was endorsed by Triple M in favor of plaintiff and deposited for collection in the same manner as the two previous drafts. Full and immediate credit was given Triple M by the plaintiff bank in the amount of $91,460.50. This draft together with the attached invoices and Certificates of Origin were then sent to I.C.B. of New Orleans for collection but payment was refused. The draft was returned together with the attached docu-

ments which have remained in the possession of the plaintiff until the time of this suit (Tr. pp. 20, 21, 22).

On December 8, 1969, Triple M executed a second draft on Jefferson Sales in the amount of $174,974.76 (Exhibit P–10), which allegedly covered all sums due on all contracts between Triple M and Jefferson Sales. This draft was endorsed in favor of the plaintiff bank and presented, together with documents attached thereto, to an agent of Jefferson Sales in Poplarville, Mississippi by an agent for the plaintiff bank, but payment was refused ·(Tr. pp. 25, 26).

It should be noted that the validity of the $174,974.76 sum· allegedly owed by Jefferson Sales on contracts with Triple M was never fully established in the trial of this case, because this controversy was settled between the plaintiff and Jefferson Sales prior to the presentation of any defense by the latter and prior to any proof in support of their counter-claim for $122,405.00, which involved many alleged defects in the trailers delivered, in addition to a claim for $43,000 Louisiana and Mississippi use taxes to which Jefferson Sales contended Triple M Homes was obligated to pay under the verbal contracts. Accordingly, the Court has omitted from this opinion facts unnecessary to the presentation of an orderly sequence of events and a determination of the remaining issues herein between the plaintiff bank, the Trustee for Triple M Homes and the U. S. Government.

The plaintiff bank gave no immediate credit to Triple M on this $174,974.76 draft, which included the sum of $91,-460.50 previously unpaid by Jefferson Sales. The total sum the bank contends was advanced against the two drafts is $135,054.68 which includes a $1,500 interest charge. It was the testimony of Bohannon that the difference between $91,460.50 and $135,054.68 was the result of a returned check in the amount of $30,000, and an $11,500 check issued on Triple M to purchase money orders to put in the payroll account, both executed on December 8, 1969, and also a second returned check in the amount of $16,000

executed on December 11, 1969 (Tr. p. 35; Exhibit T–2; Exhibit P–23). The $11,500 money order notation first appeared on Triple M's February 27, 1970 bank statement, the account having been credit with this amount on February 10, 1970 and a figure of $31,092.18 on February 9, 1970 in order to offset the total overdraft of $42,591.18. Thus, the plaintiff bank closed out Triple M's account by entering on the debit side of its collection sheet $135,054.68 and crediting the other entries of $91,460.50, $31,092.-18 and $11,500 (Tr. pp. 36, 59, 60, 61; Exhibit P–3).

Triple M's December 17, 1969 bank statement reflects that subsequent to the bank's giving full and immediate credit on the $91,460.50 draft, there were numerous withdrawals against the account including one for $22,908.50 on December 3, 1969, representing an Advice of Charge for the purchase of certain bank money orders payable to Triple M or its customers; several checks totaling less than $1,000 payable to various individuals and companies; numerous charges for returned checks due to nonsufficient funds, the bank charging $1.00 whether the check is eventually paid or not; and on December 5, a check payable to Montgomery Homes Corporation in the amount of $54,000 (Exhibit T–2; Exhibit P–20; Tr. pp. 57, 58, 59). Bohannon testified he was unable to pin-point those checks returned for insufficient funds during this period but noted that those checks paid were at the instructions or directions of Triple M Homes, not the plaintiff bank (Tr. pp. 50, 51). Thereafter, on December 8, 1969 the bank statement reflects the charges against the account for the heretofore mentioned $30,000 returned check, and on December 11, 1969 for the $16,000 returned check, in addition to numerous other charges for nonsufficient funds, and closing with an overdrawn balance of $29,468.56 (Exhibit T–2).

On December 10, 1969, there was an additional written assignment by Triple M to the plaintiff in which Triple M agreed, while noting the rights of the

assignee bank which existed by virtue of the endorsement of the two drafts, to assign in consideration of the payment theretofore made all its rights to recover for the purchase price of mobile homes from Jefferson Sales. Additionally, the assignment stated that the bank held the drafts by purchase and not as collateral; that the assignment was with full recourse and the accounts represented by the drafts were free of any security interest or encumbrance; and that all rights of the assignee bank would inure to its benefit and to the benefit of its legal representatives and assigns. This assignment bears the signature of R. R. Buckley, Vice-President of Triple M Homes (Exhibit P–11).

This suit was filed by the plaintiff against Jefferson Sales on December 18, 1969. The Trustee for Triple M Homes and the United States of America became parties thereafter by intervention and interpleader, respectively.

On January 13, 1970, the plaintiff received from Joel A. Montgomery, one of its directors and stockholders, an agreement guaranteeing the payment by him of Triple M's indebtedness to the bank (Exhibit P–24).[1] Bohannon testified that he had earlier discussed with Montgomery the situation concerning the outstanding drafts, Montgomery having advised him that he would see that the bank did not lose any money and that he felt the items were collectible. Bohannon further testified that he later requested Montgomery "to put in writing and sign a guaranty agreement to the Triple M Homes guaranteeing this amount to be in writing" in order to have something in his files in the event something happened to Montgomery (Tr. p. 44). Montgomery testified that he agreed to pay the amount owed the bank and thus executed this guaranty agreement in order to prevent any difficulties by the bank with the bank examiners and because he was of the opinion that the unpaid drafts on Jefferson Sales were collectible items (Tr. pp. 70, 71, 72).

Thereafter, on March 6, 1970, subsequent to demands by bank examiners that the items be paid or charged off the books, Montgomery paid the plaintiff bank, through the Union Planners. Bank of Memphis, Tenn., the sum of $135,054.-68, thereby preventing a charge-off of these items by the plaintiff bank. This payment was made by Montgomery with the understanding that the bank would continue to prosecute the lawsuit against Jefferson Sales (Tr. pp. 38, 46, 71, 72). The plaintiff bank had no guarantee of the account at the time credit was given or funds advanced to Triple M against any drafts. Bohannon did testify, however, that he had discussed the Triple M account with Montgomery when it was opened, and that Montgomery had indicated that Triple M had a good contractual working relationship with Jefferson Sales and he saw nothing wrong with handling it as a regular banking item (Tr. pp. 37, 51). At no time has any party moved to make Joel A. Montgomery a party to this suit.

At this point it is necessary to digress somewhat in order to trace the development of Triple M Homes and examine its relationship with Montgomery Homes Corporation and its President, Joel A. Montgomery. Triple M Homes, Inc. was incorporated in Delaware in June of 1969 and in order to commence operations it entered into a lease agreement whereby the building, plant and equipment of Warrior Homes, Inc., a wholly owned subsidiary of Montgomery Homes Corporation, were leased by Triple M under a five year lease agreement totaling $180,000 payable at a rate of $3,000 per

---

1. By this guaranty agreement Montgomery promised to pay all then and thereafter existing overdrafts of Triple M, loans made or to be made by the bank to Triple M, monies paid by the bank or for the use of the account of Triple M, and all notes, acceptances and other paper which had been or might be discounted for or at the request of Triple M, whether made, drawn, accepted, endorsed or not endorsed by Triple M and all other obligations of any kind and character, however created or evidenced, due by Triple M to the plaintiff bank.

month. Secondly, the existing inventory of Warrior Homes, totaling $244,112, was purchased by Triple M and a Security Agreement was given in favor of Montgomery Homes. Payment under the lease was based upon a specified monthly percentage of production, initially deducted from invoices for housetrailers manufactured by Triple M under an agreement whereby Montgomery Homes purchased all of Triple M's production. Subsequently, the agreement was changed to permit Triple M to sell mobile homes to other parties, with Montgomery Homes receiving a certain percentage of the sales price in compensation for this release. Additionally, there was a separate note for $150,000, payable to Montgomery Homes by Triple M at a rate of $2,500 per month (Tr. pp. 63, 64, 65, 84, 91; Exhibit T–13).

Montgomery testified that in June or July of 1969, after Triple M had become delinquent in its payments, he sent R. R. Buckley, Sales Manager, to the Haleyville, Alabama plant. The witness further testified that a month later Buckley resigned from Montgomery Homes Corporation in order to become an officer and stockholder in Triple M Corporation, and that after that time he did not have any agency or employee relationship whatsoever with Montgomery Homes (Tr. pp. 66, 67).

In October of 1969 Montgomery Homes subleased to Triple M a mobile home plant in Memphis, Texas. Montgomery testified that the total balance on this ten year lease was $200,000, payment to be computed on the basis of 6% of production. An additional $175,000 was owed on notes signed by Montgomery Homes for this plant's working capital, payable at the rate of $2,500 per month (Tr. pp. 64, 92, 93).

Montgomery testified on cross examination that the total amount due and owing Montgomery Homes by Triple M's Haleyville plant as of December 1969 totaled $231,500.00 as compared to a total amount received from Triple M of $231,699. He noted, however, that he was not a bookkeeper, and the computations were made in the courtroom utilizing the figures there available (Tr. p. 91; Exhibit P–13). Although noting the extreme difficulty in ascertaining the exact amounts due and owing Montgomery Homes by Triple M's Memphis, Texas plant as of December, 1969, because he did not have the production figures on which the 6% payment was based, Montgomery did testify that utilizing a conservative figure of two houses per day, a total of approximately $30,000 would be owing on the lease and an additional $2,500 per month on the note, totaling approximately $40,000. The witness pointed out, however, that he could be in error in the amount of production inasmuch as he knew that they did extremely well and their projection for production had been much higher (Tr. pp. 93, 94, 95).

As heretofore noted, during the trial of this case on April 5, 1971, this matter was settled between the First National Bank of Sikeston, Missouri and Jefferson Sales and Distributors, Inc., upon the payment into the registry of this Court by Jefferson Sales of $117,500, both the Trustee and the United States of America not desiring or being unable to prove an indebtedness by Jefferson Sales of any greater amount. It is thus necessary for this Court, as stated in the Settlement Order signed by all parties, "to determine the ownership of the said money to be paid herein."

Although the Uniform Commercial Code has been adopted both in Missouri, the location of the plaintiff bank, and Alabama, the location of Triple M Homes, and the Code provisions insofar as they relate to the transactions involved herein are identical in both states, this Court is of the opinion that Missouri Law should be applied in this case, inasmuch as the parties did not agree in advance as to the applicability of the law of either state as provided in § 1–105(1). Transactions herein are governed by the applicable provisions of § 4–102 UCC, 400.4–102, V.A.M.S., which states:

"The liability of a bank for action or nonaction with respect to any item

handled by it for purposes of present-ment, payment or collection is governed by the law of the place where the bank is located."

Although a multitude of issues have been injected into this lawsuit by the parties, the determinative issues can be divided into two major facets. Initially, the Court must determine whether the plaintiff bank, prior to the entrance of Joel A. Montgomery into the picture as a guarantor and ultimate payor, was afforded, under the UCC, a security interest in the drafts and Certificates of Origin and the proceeds thereof for the full amount of credits given or advances made when the documents were taken for collection, with the corresponding right to proceed against the drawee, Jefferson Sales, Inc. Conversely, the Trustee for Triple M and the United States Government argue that there was never any security interest in favor of the bank as a result of the drafts and Certificates of Origin and that the plaintiff assignee of a draft acquired no right of action against the drawee, Jefferson Sales, as a result of the drafts being dishonored. Secondly, the Court must consider the effect of the guaranty agreement and subsequent payment to the bank of the sum of $135,054.68 by Montgomery. The bank contends that he was thereby subrogated to all rights of the bank to the recovery of the $117,500 paid into the Registry of this Court. The Trustee and United States Government contend that this was a "final settlement" and therefore a realization of any security interest the bank might have had under the UCC, and that Montgomery has no claim to the fund except as an unsecured creditor of Triple M Homes by virtue of his guarantee of its indebtedness.[2]

Under Article 4 of the UCC, a collecting bank is any bank holding an item for collection except a payer bank. An item is defined as any instrument for the payment of money including a "documentary draft", a negotiable or non-negotiable draft with accompanying documents, securities, or other payments to be delivered against honor of the draft.[3] It is clear that the drafts in question are items held for collection and the plaintiff bank is the "collecting bank" under the provisions of the UCC.

As a collecting bank, the plaintiff "has a security interest in an item and any accompanying documents or the proceeds of either "(a) in case of an item deposited in an account to the extent to which credit given for the item has been withdrawn or applied; " . . . or "(c) if it makes an advance on or against the item." V.A.M.S., 400.4–208(1) (a), (c). It is undisputed in the record that on December 2, 1969 Triple M executed, endorsed and deposited for collection with the plaintiff bank a draft on Jefferson Sales in the amount of $91,406.50 for which it was given full and immediate credit and subsequently withdrew all sums represented by this draft. Likewise, it is uncontradicted in the record that on December 8, 1969, Triple M executed, endorsed and deposited with the plaintiff bank a draft in the sum of $174,974.76, which included the sum represented by the December 2nd draft, against which the bank advanced an additional sum of $42,592.18, representing the total overdraft created by the heretofore mentioned returned checks and paid money order check. Thus, the plaintiff bank obtained a security interest in the drafts, documents, and the proceeds thereof pursuant to provisions of the

2. Inasmuch as the government's notice and levy was served subsequent to the filing of the volunteer Petition in Bankruptcy of Triple M on April 20, 1970, the government concedes it took nothing into possession by virtue of the levy and, pursuant to § 67(c) (3) of the Bankruptcy Act, the payment of the Federal Tax Liens must therefore be postponed in favor of the first and second priorities of § 64(a) of the Bankruptcy Act. The U. S. Government thus concedes that its position is no better than that of the Trustee for Triple M Homes, and specifically adopts his contentions and argument herein.

3. V.A.M.S. § 400.4–105(d); § 400.4–104 (g) (f).

UCC, V.A.M.S., § 400.4–208(1) (a), (c), which continued to exist in favor of the plaintiff so long as it did not receive a "final settlement" for the item or give up possession of the item or documents for purposes other than collection. V.A. M.S., § 400.4–208(3).

The applicability of § 4–208(1) (a), (c) of the UCC under the facts of the case sub judice becomes even clearer upon an examination of the official commentary, which provides:

"Purposes:

 1. Subsection (1) states a rational rule for the interest of a bank in an item. The customer of the depository bank is normally the owner of the item and the several collecting banks are his agents (Section 4–201). A collecting agent may properly make advances on the security of paper held by him for collection, and when he does acquires at common law a possessory lien for his advances. Subsection (1) applies an analogous principle to a bank in the collection chain which extends credit on items in the course of collection. The bank has a security interest to the extent stated in this section. To the extent of its security interest it is a holder for value (Sections 3–303, 4–209) and a holder in due course if it satisfies the other requirements for that status (Section 3–302). Subsection (1) does not derogate from the banker's general common-law lien or right of set-off against indebtedness owing in deposit accounts. See Section 1–103. Rather subsection (1) specifically implements and extends the principle as a part of the bank collection process." (2 Anderson, UCC, p. 60).

Thus, the bank's common law rights are codified by the UCC which specifically implements and extends rights of the collecting bank affording its security interest in the draft, the documents and proceeds thereof.

Although any possible realization of the bank's security interest through the payment by Montgomery will be discussed hereinafter, it is clear that prior thereto the security interest created was enforceable in the absence of a security agreement, V.A.M.S., § 400.4–208(3) (a). Secondly, the security interest created in favor of the bank was not required to be filed or recorded in order to be perfected, V.A.M.S., § 400.4–208(3) (b). Additionally, § 400.9–302(1) specifically exempts "(f) a security interest of a collecting bank . . ." from the filing of a financial statement as a prerequisite to perfection. In the case of Zuke v. St. Johns Community Bank, 387 F.2d 118 (C.A. 8, 1968), the Court in applying subsection (a) of § 400.9–302 (1) of the Missouri Code held that filing was not required in order to perfect the bank's security interest in United States coins having a numismatic value which were pledged to the bank and placed in its possession as security for a loan made to the bankrupt coin company. The bank in that case thus possessed a valid lien which took priority over any claim of the bankrupt's trustee.

Finally, Section (3) (c), V.A.M.S. § 400.4–208, provides that the security interest acquired under this section "has priority over conflicting perfected security interests in the item, accompanying documents or proceeds." When the bank took these drafts for collection on December 2 and 8, 1969, allowing immediate credit on the draft for $91,460.50 which was withdrawn by Triple M and making additional advances totaling $42,592.18 against the $174,974.76 draft, it acquired a security interest pursuant to § 400.4–208(1) (a), (c) of V.A.M.S. to the extent of the sum of $135,054.68. This security interest in the drafts and their proceeds takes priority over any claims by the Trustee based on the bankruptcy petition filed on April 20, 1970, and the subordinate claims of the United States arising

from the filing of the various tax liens thereafter.[4]

This Court is not impressed with the Trustee's argument that because the security interest could not attach until ". . . the debtor has rights in the collateral" and "the debtor has no rights . . . (d) in an account until it comes into existence . . .", § 9.204(1), (2) (d), the security interest of the bank failed to attach in that some of the trailers were not delivered to Jefferson Sales until several days after the execution of the December 2, 1969 draft. Buckley testified that although all units represented by Contract No. 2 may not have been delivered by December 2nd, all units represented by the December 2, 1969 draft had been delivered as of this date

and that all trailers had been delivered by the time the December 8, 1969 draft was executed. Additionally, § 9–204(1) provides that a security interest will attach as soon as all of the events theretofore listed have taken place, namely, "until there is an agreement that it attach and value is given and the debtor has rights in the collateral." [5]

It is the contention of the plaintiff bank that its security interest in the draft, the accompanying documents or the proceeds of either carry with it the right to seek payment from Jefferson Sales on the Triple M account, as was done herein. While conceding that the UCC § 3–122(3) specifically gives a cause of action against the drawer of the draft after demand following dishonor of

4. V.A.M.S., § 400.9–301 provides:

"(1) Except as otherwise provided in subsection (2), an unperfected security interest is subordinate to the rights of
(a) persons entitled to priority under section 400.9–312;
(b) a person who becomes a lien creditor without knowledge of the security interest and before it is perfected;
(c) in the case of goods, instruments, documents, and chattel paper, a person who is not a secured party and who is a transferee in bulk or other buyer not in ordinary course of business to the extent that he gives value and receives delivery of the collateral without knowledge of the security interest and before it is perfected;
(d) in the case of accounts, contract rights, and general intangibles, a person who is not a secured party and who is a transferee to the extent that he gives value without knowledge of the security interest and before it is perfected.

(2) If the secured party files with respect to a purchase money security interest before or within ten days after the collateral comes into possession of the debtor, he takes priority over the rights of a transferee in bulk or of a lien creditor which arise between the time the security interest attaches and the time of filing.

(3) A 'lien creditor' means a creditor who has acquired a lien on the property involved by attachment, levy or the like and includes an assignee for bene-

fit of creditors from the time of assignment, and a trustee in bankruptcy from the date of the filing of the petition or a receiver in equity from the time of appointment. Unless all the creditors represented had knowledge of the security interest such a representative of creditors is a lien creditor without knowledge even though he personally has knowledge of the security interest."

5. At the trial on this matter the Trustee for Triple M Homes attempted to show through the cross examination of Bohannon and Montgomery a fraudulent arrangement between these two parties whereby the bank improperly allowed a check to clear in favor of Montgomery Homes Corporation. Additionally, the Trustee attempted to establish that Montgomery Homes Corporation was paid more than it was owed by Triple M Homes the first part of December, 1969. It is the opinion of this Court that both of these contentions are without merit. The record reveals no improprieties on the part of the plaintiff bank in the clearance of checks against Triple M's account, Bohannon testifying that those checks paid were done so at the direction of Triple M Homes and the December bank statement revealing a balance of $13,973.11 after the clearing of the $54,000 check payable to Montgomery Homes. (Tr. pp. 50, 51, 57, 58, 59; Exhibit T–2; Exhibit P–20.) Likewise, the record does not reveal any overpayment on the substantial sum owed by Triple M to Montgomery Homes as of December, 1969, this matter having been heretofore fully examined. (See pp. 12, 13.)

the instrument, the Trustee maintains that the bank does not have the right to proceed against the drawee herein, Jefferson Sales.

It is true that the more common non-payment case does involve suit by the collecting bank against the drawer of a check made payable to a bank's customer, and after deposit and receipt of full credit thereon, the customer makes a partial or total withdrawal against his account. Thereafter when the bank presents the check for collection, it is met by the defendant's stop payment order, and a suit by the bank against the drawer results (See 18 A.L.R.3rd 1376, 1381, 1388–1391 and cases cited therein).

In the case sub judice, the drafts were drawn by Triple M, the bank's depositor, pursuant to an agreement with the drawee, Jefferson Sales, and its bank, I.C.B. of New Orleans, whereby the draft procedure was established; this procedure was followed by the bank without any incurring difficulty with respect to two previous drafts executed on November 17, 1969; the Vice-President of the plaintiff bank testified that no credit would have been given on the drafts without assurances from the receiving bank, I.C.B., that the drafts would be honored; the amount of the December 2, 1969 draft in controversy was determined pursuant to an agreement reached between representatives of all parties at a meeting in New Orleans on November 30, 1969; the plaintiff bank had no notice whatsoever that the December 2nd draft would not be paid; the uncontradicted testimony of Bohannon, the bank president, was that he knew of no defect in the December 8, 1969 and took it with the understanding that he was going to collect the full amount, although he knew it included the sum represented by the unpaid December 2nd draft; Jefferson Sales has always admitted substantial liability in connection with the purchase of these trailers, but claimed there should be a set-off for alleged defects in the trailers against the total amount owed; and the plaintiff bank has at all times retained possession of the drafts and Certificates of Origin evidencing title to the trailers leased to HUD by Jefferson Sales.

■ Although none of the parties have furnished any authority directly on point, this Court is of the opinion that under the facts and circumstances of this case as set forth hereinabove, the plaintiff bank does have the right to seek payment from Jefferson Sales as the result of its security interest in the drafts, the accompanying documents, and the proceeds thereof. The security interest of the collecting bank would have little meaning absent the corresponding right to seek payment, through legal action if necessary, from the party against whom the draft is drawn, particularly when this party not only has possession of the items covered by the drafts and title documents, but also admits liability subject to a set-off for alleged defects in the items and other contractual disagreements.

The plaintiff bank convincingly argues that its right to the "proceeds" of the draft is defined in V.A.M.S., § 400.9–306(1), which provides:

> " 'Proceeds' includes whatever is received when collateral or proceeds is sold, collected or otherwise disposed of. The term also includes the account arising when the right to payment is earned under a contract right."

The bank thus claims the right, notwithstanding the absence of any formal acceptance of the drafts by Jefferson Sales, to proceed against the defendant in this cause on the contract between Jefferson Sales and Triple M.

By the above discussed assignment executed by R. R. Buckley on December 10, 1969, Triple M assigned all its right to recover for the price of mobile homes to the plaintiff bank. Section 2–210(2) of the UCC provides:

> "(2) Unless otherwise agreed all rights of either seller or buyer can be assigned except where the assignment would materially change the duty of the other party, or increase materially the burden of risk imposed upon him by his contract, or impair materially

his chance of obtaining return performance. A right to damages for breach of the whole contract or a right arising out of the assignor's due performance of his entire obligation can be assigned despite agreement otherwise."

In the case of National Shawmut Bank of Boston v. IYC and Mill Factors Corp., 322 F.Supp. 116 (S.D.N.Y., 1970), the plaintiff collecting bank brought an action against the buyer-drawer, IYC, and guarantor, Mill, to recover an amount credited to a depositary bank on receipt of a check subsequently lost before presentation to the drawee bank. IYC, the buyer, had purchased certain goods from the seller, Novaceta, and issued a check in payment thereof. Thereafter, the seller's bank had given credit to Novaceta upon deposit of the check, and forwarded it to the plaintiff bank for collection. The check was then forwarded by the plaintiff to a third bank for collection, but was lost in the mail. After attempting unsuccessfully to charge back the loss against the seller or its bank, the plaintiff bank obtained from the seller, Novaceta, an assignment of all its rights, without recourse, against the buyer, IYC. In granting summary judgment for the plaintiff bank against the buyer and his guarantor, the court noted:

"Since IYC had not discharged its obligation to Novaceta, the latter had a cause of action against IYC and Mill which it could assign. The UCC § 2–210(2) provides for assignment of an assignor's right arising out of the assignor's due performance of his entire obligation despite agreement otherwise. Here there was no agreement not to assign. Novaceta fully discharged its obligation and, therefore, could assign its rights against Mill to plaintiff. See Shapiro Bros. Factors Corp. v. Guy Hobbs, 5 UCC Rep. 518 (1968)." 322 F.Supp. at 120.

As heretofore noted, the security interests of the bank continued to exist until a "final settlement" was received on the item or possession of the drafts or accompanying documents was given up other than for collection. The Trustee for Triple M and the government contend that the payment by Montgomery was actually a "final settlement" and thus a realization of any security interest the bank might have then possessed.

The term "settle" as defined in § 4–104(1) (j), "means to pay in cash, by clearing house settlement, in a charge or credit or by remittance, or otherwise as instructed. A settlement may be either provisional or final." The official commentary on this provision of the UCC provides in part:

"The term 'settle' is a new term in bank collection language that has substantial importance throughout Article 4. . . . Tied in with this concept of credits or payments being in some way tentative, has been a related but somewhat different problem as to when an item is 'paid or 'finally paid' either to determine the relative priority of the item as against attachments, stop payment orders and the like or in insolvency situations.

\* \* \* \* \* \*

"The term 'settle' is used as a convenient term to characterize a broad variety of conditional, provisional, tentative and also final payments of items. Such a comprehensive term is needed because it is frequently difficult or unnecessary to determine whether a particular action is tentative or final or when a particular credit shifts from the tentative class to the final class. Therefore, its use throughout the Article indicates that in that particular context it is unnecessary or unwise to determine whether the debit or the credit or the payment is tentative or final. However, when qualified by the adjective 'provisional' its tentative nature is intended, and when qualified by the adjective 'final' its permanent nature is intended." (2 Anderson, UCC, p. 22)

It is uncontradicted in the record that subsequent to the time the drafts were paid, Montgomery orally agreed through Bohannon to see that the bank lost no

money as a result of the overdraft of Triple M, and the primary reason he agreed to guarantee payment of this $135,054.68 was because he felt the amount was collectible from Jefferson Sales. At that time, Montgomery was fully aware that the drafts and their accompanying title documents were in the possession of the bank and that the bank had received from Triple M a written assignment of all its rights to recover from Jefferson Sales on the mobile homes. He was also aware of the precarious financial predicament of Triple M Homes and virtual impossibility of its recovery. The guaranty agreement, which was produced for the first time at the trial of this matter, was secured by Bohannon simply to have a guarantee of payment of the overdraft in writing in the event something were to happen to Montgomery. Thus, while the agreement by its terms may guarantee the payment of Triple M's indebtedness to the bank by Montgomery, it had the effect and purpose of guaranteeing the collectibility of the outstanding drafts of Jefferson Sales. Subsequently, after demands by the bank examiners that the items either be paid or charged off the books, Montgomery paid the bank the sum of $135,054.68.

█ It is clear that the parties did not contemplate a "final settlement" by this payment to the plaintiff bank because it was made under the express condition that the bank would continue to prosecute the lawsuit theretofore filed in the attempt to recover from Jefferson Sales (Tr. pp. 38, 46, 72). Under these circumstances, the Court is of the opinion that the payment by Montgomery was not a "final settlement" under § 4–208(3), and is not a realization of the bank's security interests.

Secondly, this Court concurs with the contention of the plaintiff that to view the act of Montgomery in paying the bank as a "final settlement" would render meaningless the provisions of V.A. M.S. 400.9–504(5) which provides, "a person who is liable to a secured party under a guarantee, indorsement, repurchase agreement or the like and who receives a transfer of collateral from the secured party or is subrogated to his rights has thereafter the rights and duties of the secured party." The very act which would make Montgomery a subrogee, i. e., the payment to the bank as guarantor, does not terminate the thereby acquired rights and duties of the secured party, as would be the case if the Trustee's contention in this regard was adopted by this Court.

On March 6, 1970, over three months subsequent to the filing of this suit and for reasons heretofore examined, Montgomery paid the plaintiff bank the sum of $135,054.68. Under Rule 25(c), F.R. C.P., in the event of a transfer of interests, the action may be continued by or against the original party unless the Court, upon motion, directs that the person to whom the interest is transferred be substituted or joined with the original party. There has been no motion filed to make Joel A. Montgomery a party to this lawsuit.

In this regard, Moore's commentary on Federal Practice provides:

> "Whether or not substitution or joinder is required under Rule 25(c), this does not affect the respective substantive rights of the transferor or transferee pendente lite and it is entirely a matter of convenience.
>
> \* \* \* \* \* \*
>
> "In the event the transferee has not been substituted and joined as an additional party to the action, he nonetheless will be bound by an adverse judgment, even though not a party, for his rights are no better than his transferor's; and similarly if the judgment is in favor of the transferor, the adjudication enures to the benefit of the transferee." [6]

Furthermore, under the facts and circumstances of this case, the Court is of the opinion that Joel A. Montgomery is subrogated to all the rights and remedies of the bank asserted in this case, includ-

---

6. 2B Moore's Federal Practice, ¶ 25.08, pp. 322, 325 and the cases cited therein.

ing the right of collection on the debt itself, and has the same priority with respect to the perfected security interest as that of the plaintiff bank.[7]

 The right of subrogation arises when it is shown that the party claiming such has paid the debt, that he was not a volunteer and that he was secondarily liable. Although no general rule can be laid down as the test to be applied in all cases, the applicability depending upon the circumstances attending the payment of the debt, it should be applied where demanded by the dictates of equity, justice and good conscience.[8] Subsequent to the return of the unpaid drafts, Montgomery orally agreed to see that the bank lost no money as a result of the overdraft; executed a guaranty agreement whereby he was obligated to pay the amount of the overdraft, and subsequently paid the plaintiff bank $135,054.68. Under these circumstances, this Court is of the opinion that Montgomery qualifies as a subrogee. In the case of Phelps v. Scott, 325 Mo. 711, 30 S.W.2d 71 (1930), the Court stated:

> "It is generally held that in equity when one standing in such relation (guarantor) pays he is, at least as against the debtor primarily liable, subrogated to all the rights and remedies of the creditor, and this even without a formal assignment of the debt or judgment."

Thus, Montgomery is subrogated to all the rights of the bank, including the right to the debt itself, and has the same priority with respect to the perfected security interest as that of the bank.

The right of the plaintiff bank to recover in this cause prior to any payment by Montgomery has been clearly established, and as Montgomery's rights are identical to those of the plaintiff bank, he is entitled to recover the entire fund of $117,500 paid into the Registry of this Court.

The above shall constitute the Findings of Fact and Conclusions of Law of this Court pursuant to Rule 52(a), F.R. C.P.

A Judgment accordingly shall be presented to this Court within the time and manner prescribed by the Rules.

---

7. V.A.M.S. 400.9–504(5).

8. 50 Am.Jur., Subrogation, §§ 10, 19; 83 C.J.S. Subrogation § 5.