578 F.2d 904
 In the Matter of OLLAG CONSTRUCTION EQUIPMENT CORP., Bankrupt.
MANUFACTURERS AND TRADERS TRUST COMPANY, Appellant,
v.
Karl GOLDMAN, as trustee of Ollag Construction Equipment
Corp., Bankrupt, Appellee.
 Nos. 1003, 1204, Dockets 78-5020, 78-5022.
 United States Court of Appeals,
Second Circuit.
 Argued June 8, 1978.
Decided June 26, 1978.
 
 William H. Gardner, Buffalo, N.Y. (Hodgson, Russ, Andrews, Woods & Goodyear, Buffalo, N.Y., of counsel), for appellant.
 Peter L. Costa, Buffalo, N.Y. (Goldman, Costa & Getman, Buffalo, N.Y., of counsel), for appellee.
 Before KAUFMAN, Chief Judge, FEINBERG, Circuit Judge, and WERKER, District Judge.*
 IRVING R. KAUFMAN, Chief Judge:
 
 
 1
 When financial storms rage, unsecured creditors take on collateral as ballast. The security thus gained is often tenuous, however, for if bankruptcy is involved, it may be dissolved by the trustee's challenge. In this case, we are called upon to decide whether Manufacturers & Traders Trust Company ("the Bank") may enforce a security interest in the property of the bankrupt Ollag Construction Equipment Corp. ("Ollag"), or whether, as Ollag's trustee contends, the Bank's claim is a voidable preference under § 60 of the Bankruptcy Act.[1] Since we believe that the courts below inadequately considered the crucial issue of Ollag's solvency when the security interest was created, we reverse and remand to the bankruptcy court for further findings.
 
 I.
 
 2
 Ollag's financial demise was triggered when the construction business operated in Lancaster, New York, by the four Gallo brothers Leopold, Anthony, Michael, and James fell on hard times. An equipment leasing firm, Ollag was but one of the three corporate constituents of this family enterprise. It was a wholly-owned subsidiary of Deplan Contracting Inc. ("Deplan"), a construction firm that accounted for more than ninety percent of Ollag's rentals. The third Gallo corporation, Sheldon Builders Supply Corp. ("Sheldon"), owned the real estate quartering the Deplan and Ollag facilities.
 
 
 3
 In late 1972, the Gallos learned that Deplan's financial condition was grave because approximately $300,000 in accounts payable had not been recorded in the company's books. Deplan's creditors became aware of this state of affairs in January 1973, as Deplan began to default on a number of construction projects. Meetings were held to discuss refinancing the stricken business. The principal creditor participants were the Bank and the Traveler's Indemnity Company ("Travelers"). The Bank held Deplan's note in the sum of $200,000, collateralized by a security interest in equipment Deplan owned separately from Ollag. It had also obtained a mortgage on Sheldon's real estate, and payment guaranties from Ollag and the Gallos and their wives. Travelers had written performance and payment bonds for Deplan's projects, and Ollag, Sheldon, and the Gallos had also agreed to indemnify Travelers against liability on these bonds,[2] a fact of which the Bank claims ignorance.
 
 
 4
 While the discussions continued, the security interest at issue in this case came into being. In February 1973, Leopold Gallo, Ollag's president, executed at the Bank's request a chattel mortgage on Ollag's inventory and equipment to serve as security for Ollag's guaranty of Deplan's note.[3] The proposed refinancing never occurred. By March 1973, it was readily apparent that, even with an infusion of new funds, Deplan would soon be insolvent again. Although Deplan attempted to avert disaster by filing a petition under Chapter XI to rearrange its debts, even that maneuver failed. To no one's surprise, Deplan was adjudicated a bankrupt.
 
 
 5
 In June, Travelers, having undertaken to finish Deplan's construction projects after the latter's default, filed an involuntary petition against Ollag. The Bank, without delay, submitted a reclamation petition asserting its security interest in Ollag's equipment. The trustee counterclaimed, seeking an avoidance of the Bank's claim.[4] The rather complex issues presented by these stratagems are now before us. Bankruptcy Judge McGuire decided that the Ollag security interest was invalid both under New York law and as a voidable preference under § 60 of the Bankruptcy Act. On review by the district court, Judge Elfvin reversed the determination that the security interest transgressed New York law, but affirmed the judgment on the basis of § 60. Both the Bank and the trustee appealed.
 
 II.
 
 6
 We have little difficulty in disposing of the trustee's contention on his appeal that the security agreement was void because it did not further any of Ollag's corporate purposes and had not been ratified by Ollag's shareholders in accordance with N.Y. Bus. Corp. Law § 908.[5] It is clear that the security agreement did in fact serve a valid corporate purpose by attempting to avert the bankruptcy of Ollag's parent and principal customer, Deplan.[6] Accordingly, under N.Y. Bus. Corp. Law § 202(a)(7), shareholder ratification of the agreement was unnecessary.[7]
 
 
 7
 Nevertheless, the trustee argues that even if shareholder approval was not required, the security agreement is without force because Leopold Gallo, president of Ollag, did not have authority to execute it on its behalf. But Leopold's right to act for Ollag was conclusively established by a resolution adopted by Ollag's board of directors before any suggestion of trouble in the Gallo enterprises. It granted any one officer of Ollag authority to execute security agreements with the Bank on behalf of Ollag. Accordingly, we have no hesitation in finding that the security agreement complied with New York law.[8]
 
 III.
 
 8
 We now turn to the trustee's assertion that the Bank's security interest in Ollag's inventory and equipment is a voidable preference. The Bank argues that of the seven prerequisites for voidability under § 60 of the Act,[9] the trustee has failed to establish two. It asserts that Ollag was not insolvent when the security interest was taken and, moreover, that the Bank did not have reasonable cause to believe that Ollag was then insolvent. We remand for further findings on both issues.
 
 A.
 
 9
 A debtor is insolvent under the Bankruptcy Act if "the aggregate of (its) property . . . shall not at a fair valuation be sufficient in amount to pay (its) debts."[10] For purposes of § 60 of the Act, insolvency is determined as of the time of the alleged preferential transfer.[11]
 
 
 10
 In February 1973, Ollag's physical assets consisted entirely of construction equipment valued at approximately $100,000 to $165,000.[12] Its only liabilities of any significance were its contingent obligations as guarantor of Deplan's note and as indemnitor on Deplan's performance and payment bonds. But these liabilities were tied to certain intangible assets. For example, although the face amount of Ollag's guaranty on Deplan's note was $200,000, Ollag had a right of subrogation to recover against Deplan on the Bank's claims. Moreover, Ollag could demand contribution from the co-guarantors, Sheldon and the Gallos. Similarly, Ollag's indemnity liability to Travelers might have been offset by a recovery over against Sheldon and the Gallos, who were also co-indemnitors. All of this leads us to the conclusion that there were important factors weighing on the question of Ollag's insolvency which were not considered below.
 
 
 11
 Learned Hand's landmark opinion in Syracuse Engineering Co. v. Haight, 97 F.2d 573, 576 (2d Cir. 1938), taught us that contingent subrogation and contribution rights must be valued as assets in determining solvency. See also Updike v. Oakland Motor Car Co., 53 F.2d 369, 371 (2d Cir. 1931); Wingert v. President Director & Company of Hagerstown Bank, 41 F.2d 660 (4th Cir.), Cert. denied, 282 U.S. 871, 51 S.Ct. 77, 75 L.Ed. 769 (1930). Cf. Schwartz v. Commissioner of Internal Revenue, 560 F.2d 311, 317 (8th Cir. 1977). In the case at bar, we are left in murky obscurity regarding the actual value of Ollag's contingent assets. The courts below treated Ollag's subrogation right against Deplan as effectively valueless.[13] It is obvious, however, that, holding a valid security interest in Deplan's equipment as collateral for the $200,000 note, the Bank could expect to collect a substantial portion of its debt even if Deplan were insolvent. Indeed, the Bank eventually recovered approximately $139,000 through the sale of Deplan's equipment. As subrogee, Ollag was the successor to all of the Bank's rights against Deplan, including the Bank's security interest in Deplan's equipment. N.Y.U.C.C. § 9-504(5). See, e.g., First National Bank v. Jefferson Sales & Distributors, Inc., 341 F.Supp. 659 (S.D.Miss.1971), Aff'd per curiam, 460 F.2d 1059 (5th Cir. 1972). Accordingly, we must conclude that the bankruptcy judge's finding, affirmed by Judge Elfvin, that Ollag's subrogation right against Deplan was of minimal worth is clearly erroneous.
 
 
 12
 But we must also consider the extent, if any, of Ollag's liability to Travelers under the indemnity agreement. The Bank contends that the trustee has failed to meet his burden of proof in establishing this liability, See Cohen v. Sutherland, 257 F.2d 737 (2d Cir. 1958), and if it is excluded, Ollag was almost certainly solvent in February 1973.[14] On the record before us, however, we cannot agree. Although the liability was not specifically assessed below, there is evidence in the record from which a valuation might be estimated.[15] We leave the question of the sufficiency of this evidence to the bankruptcy court in the first instance. Accordingly, we reverse the determination that Ollag was insolvent in February 1973 and remand to the bankruptcy court for specific findings of the value, as of February 1973, of:
 
 
 13
 (1) Ollag's physical assets;
 
 
 14
 (2) Ollag's right of subrogation to the Bank's secured claim against Deplan;
 
 
 15
 (3) Ollag's rights of contribution against Sheldon and the Gallos as co-guarantors of Deplan's note to the Bank and co-indemnitors on Travelers's performance and payment bonds;
 
 
 16
 (4) Ollag's expected liability to Travelers under the indemnity agreement covering the performance and payment bonds, assuming that liability is established.
 
 
 17
 These assessments are to be made with "such detail and exactness as the nature of the case permits." Kelley v. Everglades Drainage District, 319 U.S. 415, 420, 63 S.Ct. 1141, 1144, 87 L.Ed. 1485 (1943). We recognize that valuation of contingent assets and liabilities is an arduous task, and on occasions only approximations can be made. For this reason, reversals under Bankruptcy Rule 752[16] are appropriate only when the reviewing court cannot determine the basis of the ruling below. In re D. H. Overmyer Co., 510 F.2d 329 (2d Cir. 1975). Nevertheless, although we do not decide whether the decision below would have passed muster under Rule 752 absent the clear undervaluation of Ollag's subrogation claim against Deplan, we note that more detailed findings originally could have obviated the need to remand the case.
 
 B.
 
 18
 Since we do not decide whether Ollag was insolvent when the security interest was taken, we cannot resolve the related question whether the Bank had reasonable cause to believe that the debtor was insolvent at that time. But we must conclude that, as a sophisticated creditor deeply involved in Deplan's financial woes and well aware of the close relationship between Deplan and Ollag, the Bank was "on inquiry" with respect to matters affecting Ollag's financial condition. See In re Hygrade Envelope Corp., 366 F.2d 584, 588-89 (2d Cir. 1966); Miller v. Wells Fargo Bank International Corp., 406 F.Supp. 452, 464-65 (S.D.N.Y.1975), Aff'd, 540 F.2d 548, 555-56 (2d Cir. 1976). Proper inquires would certainly have disclosed the existence of Ollag's indemnity agreement with Travelers. Accordingly, we hold that the Bank is chargeable with knowledge of that arrangement. If the bankruptcy court determines on remand that Ollag had a negative net worth in February 1973, it should then consider whether, with knowledge of all information available upon diligent inquiry into the Gallo enterprise's affairs, the Bank would have had reasonable cause to conclude that Ollag was insolvent.
 
 
 
 *
 Of the Southern District of New York, sitting by designation
 
 
 [1]
 Bankruptcy Act § 60, 11 U.S.C. § 96, provides:
 (a)(1) A preference is a transfer, as defined in this Act, of any of the property of a debtor to or for the benefit of a creditor for or on account of an antecedent debt, made or suffered by such debtor while insolvent and within four months before the filing by or against him of the petition initiating a proceeding under this Act, the effect of which transfer will be to enable such creditor to obtain a greater percentage of his debt than some other creditor of the same class.
 (b) Any such preference may be avoided by the trustee if the creditor receiving it or to be benefited thereby or his agent acting with reference thereto has, at the time when the transfer is made, reasonable cause to believe that the debtor is insolvent.
 
 
 [2]
 Michael Gallo had withdrawn from the enterprise because of a conflict of interest, but he and his wife remained indemnitors on the bonds and guarantors of the note
 
 
 [3]
 Leopold Gallo testified at the hearing before Judge McGuire that he did not read the agreement before signing it and that he understood it to be a prerequisite to a refinancing of Deplan by the Bank
 
 
 [4]
 Pursuant to stipulation, the trustee sold Ollag's equipment at auction, and this litigation concerns the proceeds of that sale
 
 
 [5]
 N.Y. Bus. Corp. Law § 908 (McKinney 1963) provides:
 A guarantee may be given by a corporation, although not in furtherance of its corporate purposes, when authorized at a meeting of shareholders by vote of the holders of two-thirds of all outstanding shares entitled to vote thereon. If authorized by a like vote, such guarantee may be secured by a mortgage or pledge of, or the creation of a security interest in, all or any part of the corporate property, or any interest therein, wherever situated.
 
 
 [6]
 See, e.g., McCarty v. Nostrand Lumber Co., 232 App.Div. 63, 248 N.Y.S. 606 (2d Dep't 1931); Bacon v. Montauk Brewing Co., 130 App.Div. 737, 115 N.Y.S. 617 (1st Dep't 1909)
 
 
 [7]
 N.Y. Bus. Corp. Law § 202(a) (McKinney 1963) provides:
 Each corporation, subject to any limitations provided in this chapter or any other statute of this state or its certificate of incorporation, shall have power in furtherance of its corporate purposes:
 (7) To make contracts, give guarantees and incur liabilities, borrow money at such rates of interest as the corporation may determine, issue its notes, bonds and other obligations, and secure any of its obligations by mortgage or pledge of all or any of its property or any interest therein, wherever situated.
 
 
 [8]
 Judge McGuire originally found that Leopold did not have the requisite authority, but he withdrew that finding as unnecessary in view of his holding that the security agreement was void under § 908. Judge Elfvin stated that he would have remanded for a finding were he not affirming the holding that the security interest was a voidable preference. But an appellate court is as well placed as a trial court to construe a written instrument, Adler v. Nicholas, 381 F.2d 168, 170-71 (5th Cir. 1967); Cf. In re Morasco, 233 F.2d 11, 14-15 (2d Cir. 1956), and we therefore see no need for further findings on the issue. The trustee has not pointed to anything in the record or in New York law that would warrant our looking past this explicit authorization
 
 
 [9]
 3 Collier on Bankruptcy PP 60.07-.35, .52-.56 (14th ed. 1977). The Bank originally contended that the security interest did not enable it to "obtain a greater percentage of (its) debt than some other creditor of the same class," but it does not press the point on appeal
 
 
 [10]
 Bankruptcy Act § 1(19), 11 U.S.C. § 1(19)
 
 
 [11]
 3 Collier on Bankruptcy, supra, P 60.31. For preference purposes, the transfer was effected on February 6, 1973, when the security interest was perfected by filing. See Bankruptcy Act § 60(a)(2), 11 U.S.C. § 96(a)(2)
 
 
 [12]
 The assets were appraised in 1971 at $166,650 and in 1972 at $148,900. They were appraised at $131,200 on June 28, 1973, two days before they were sold at auction for $98,000
 
 
 [13]
 Judge McGuire held that because Deplan, Sheldon, and the Gallos were all insolvent when the transfer was effected, subrogation and contribution rights against them would be worth little. Reviewing this finding under the "clearly erroneous" rule of Bankruptcy Rules 752 and 810, Judge Elfvin affirmed
 
 
 [14]
 If we value Ollag's equipment conservatively at the distress sale price of $98,000, and Ollag's subrogation claim against Deplan at the $138,951.01 that the Bank recovered on Deplan's equipment, then Ollag had a positive net worth of some $28,000 as of February 1973 if the Travelers liability is excluded. Because we do not rule on the latter issue, however, these figures are cited merely for the purpose of explaining our concern. We are not to be understood to have determined the proper valuation for either Ollag's physical assets or its claim against Deplan
 
 
 [15]
 Documents and testimony introduced at trial showed expenditures by Travelers of some $274,000 through 1976. Although it is not clear whether the documents show every recovery Travelers made from sources other than Deplan, Ollag, or the Gallos, the Bank's contention that the documents show No such recoveries is incorrect. The claim record for the Erie County Water Authority project, Defendant's Exhibit J, shows credits of some $65,230.90. We do not pass on whether these documents are sufficient to establish a value for Ollag's contingent liability as of February 1973, but in the absence of a finding below we cannot say that there is so little evidence concerning that liability as to justify excluding the liability from consideration on remand
 
 
 [16]
 Bankruptcy Rule 752, the bankruptcy counterpart to Fed.R.Civ.P. 52, provides:
 (a) Effect. In all matters tried upon the facts without a jury or with an advisory jury, the court shall find the facts specially and state separately its conclusions of law thereon . . . . Findings of fact shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge of the credibility of the witnesses. If an opinion or memorandum of decision is filed it will be sufficient if the findings of fact and conclusions of law appear therein.