## BACON v. MONTAUK BREWING COMPANY et al.

(Supreme Court, Appellate Division, First Department. March 12, 1909.)

1. BILLS AND NOTES (§ 362*)—PURCHASE FROM BONA FIDE PURCHASER.

Where plaintiff sued on notes made by defendant company to the E. Company, indorsed before maturity by the payee and by the M. Company's president to the D. Company, and indorsed after maturity to plaintiff, it was improper to allow defendant to show an understanding between defendant's president and E.'s representative when the notes were made and transactions between defendant and E., where it was not shown that D. had notice of such facts.

[Ed. Note.—For other cases, see Bills and Notes, Cent. Dig. § 939; Dec. Dig. § 362.*]

2. CORPORATIONS (§ 515*)—NOTES—ACTION ON—DEFENSES—PLEADING.

The defense of ultra vires must be pleaded to be available in an action against a corporation on a note.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. § 2082; Dec. Dig. § 515.*]

3. CORPORATIONS (§ 467*)—NOTES—POWER TO MAKE.

A corporation can neither make nor indorse commercial paper for accommodation, though paid therefor, but the rule does not apply where a corporation assumes another's obligation to protect its own interests.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. § 1831; Dec. Dig. § 467.*]

4. CORPORATIONS (§ 429*)—NOTES—AUTHORITY OF OFFICERS—DUTY TO MAKE INQUIRY.

Persons dealing with a brewing company could assume that its president and treasurer were authorized to make notes to discharge notes made by another company in which it was interested.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. § 1720; Dec. Dig. § 429.*]

5. CORPORATIONS (§ 400*)—OFFICERS—AUTHORITY—NOTICE.

A company which took defendant company's notes to discharge notes of another company in which defendant was interested were not bound by by-laws limiting defendant's president and treasurer's powers, where it did not know thereof.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 1590, 1591, 1722; Dec. Dig. § 400.*]

6. BILLS AND NOTES (§ 92*)—CONSIDERATION—SUFFICIENCY.

Cancellation of notes against another company, whereby defendant was protected from interference with its business relations, was sufficient consideration to sustain notes made by defendant.

[Ed. Note.—For other cases, see Bills and Notes, Cent. Dig. § 196; Dec. Dig. § 92.*]

Scott, J., dissenting.

Appeal from Judgment on Report of Referee.

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

Action by George T. Bacon against the Montauk Brewing Company and others. From a judgment in favor of defendant company, plaintiff appeals. Reversed, and new trial ordered.

Argued before PATTERSON, P. J., and McLAUGHLIN, LAUGHLIN, HOUGHTON, and SCOTT, JJ.

John E. Brodsky, for appellant.

Martin S. Lynch, for respondent.

LAUGHLIN, J. This action is brought to recover on four promissory notes alleged to have been made by the defendant Montauk Brewing Company on the 12th day of September, 1906, payable in one, two, three, and four months, respectively, to the order of Eurich's Ft. Hamilton Brewery, and indorsed by it and by one Edward H. M. Roehr, who was the president of the maker, which notes were delivered to the Duluth Brewing & Malting Company before maturity, and after maturity were assigned to plaintiff. The other defendants did not appear on the trial. The Montauk Company by its answer put in issue the allegations of the complaint with respect to the delivery of the notes to plaintiff, and to his being a bona fide holder thereof for value, and denied the execution of the notes or that it received any consideration therefor, and alleged want of consideration; and, as separate defenses, it alleged that the execution of the notes was unauthorized, that they were signed, if signed at all, by said Roehr who received the consideration, if any, individually, and not for the benefit of the company, and that he made, signed, and executed the notes fraudulently for the purpose of defrauding the company and of converting the proceeds thereof to his individual use, and did receive and take the avails, if any, for his own use, and that the payee knew at the time the notes were made that they were not executed for the benefit of the Montauk Company.

The referee held that the notes were invalid and void against the Montauk Company, and found that they "were executed and delivered and intended to be used in payment of a pre-existing indebtedness" of the Eurich Brewery to the Duluth Company, of which the latter had notice; that the notes were made for the accommodation of the Eurich Brewery, and no consideration passed to or was received by the Montauk therefor; that neither the execution nor the delivery of the notes was authorized by any resolution, the board of directors, or by the by-laws of the Montauk Company; that the Eurich Brewery was indebted to the Montauk Company at the time in the sum of $3,000 or more, and that the notes were assigned to the plaintiff after they became due. The referee also found that the notes were made by the Montauk Company and indorsed and delivered to the Eurich Brewery, which was then indebted to the Duluth Company on certain promissory notes for the same amount which were then past due and unpaid, and which at the time of the delivery of the notes in suit to the Duluth Company were marked, "Canceled and paid," and surrendered to the maker thereof; that Roehr was president and Remsen was treasurer of the Montauk Company, and constituted a majority of its board of directors, and that the notes were executed in the name of the company by them in the names of their respective offices.

It appears: That one Hoch, who was a director and the manager of the Duluth Company, called on Eurich, the treasurer of the Eurich Brewery, on the day the notes were executed, with a view to obtaining payment on the last due notes of the Eurich Brewery then held by his company, and they together called on Roehr, the president, and Remsen, the treasurer, of the Montauk Company. That Hoch informed them, in substance, that his company held these past-due notes against the Eurich Brewery, the financial condition of which had been explained to him, which was that it was unable to pay them, and that he had been informed by Eurich that the Montauk Company had a contract to take all of the output of beer of the Eurich Brewery. That the notes which his company held against the Eurich Brewery were given for malt which had been used in the manufacture of that beer, and that Eurich claimed that in the circumstances these notes should be paid by the Montauk Company, "and not pressed" against the Eurich Brewery. That Roehr then inquired of Eurich concerning the obligations of the Eurich Brewery, and was informed that it was not in a position to pay these notes excepting out of the receipts of the beer sold to the Montauk Company, and that it only had a few other obligations outstanding that were not secured. That Roehr then stated that the customers of his company were being supplied from the Eurich Brewery, and that his company was using that beer in connection with its own, but that his company was not in a position to take care of the notes at that time, and that his attention had been previously drawn to the matter by one Montgomery, who was also present at the interview, some time before, and that after stating these things, Roehr said:

"We don't want you to get left in the matter. We will pay you, but we want a little time. In the meantime the account of the Eurich's Brewery will accrue, so that there will be more than enough on hand to pay these notes."

That Hoch then said to Roehr that if he would satisfy him that the Montauk Company was responsible, and not another Eurich affair, "all wound up in chattel mortgages, and so forth," that he would give all the time required. That Roehr replied that he personally was financially responsible, and to show his faith in the Montauk Company he would indorse the notes, whereupon Hoch stated that, if he found upon investigation that the securities that he was receiving were no better than those he had, he would return them, and either call for better security or proceed against the Eurich Brewery, and Roehr replied, in substance, that he might do so. That, after making inquiries concerning Roehr's standing, he accepted the notes, but Roehr first made out similar notes payable to the Duluth Company and made the notes in suit at the suggestion of Hoch, who stated that he would prefer to have them payable to Eurich's Brewery, as his company's dealings had been with it, and then have them indorsed over to his company. That thereupon the first notes drawn by Roehr were destroyed, and the notes in suit were filled out, signed, and delivered to Eurich, who indorsed them in the name of his company, and they were then indorsed by Roehr and delivered to Hoch for the Duluth Company who thereupon marked the past-due notes of the Eurich Brewery, "Canceled and paid," and surrendered them to Eurich in exchange for the notes in suit.

Hoch· further testified that Roehr told him at this interview, before the execution and delivery of the notes, "that the Montauk Company had bought the product of the Eurich's Ft. Hamilton Brewery, and that the beer from that product was now being delivered to their customers, and for that reason he was willing to assume this obligation, providing I give him time." Shortly after this transaction, Roehr's relations with the Montauk Company terminated. He was not a witness on the trial, and it is to be inferred that his whereabouts was unknown. The only witnesses called by the defendant were Remsen, its treasurer, and one Rhinehart, who was the third director of the company. Remsen testified that he and Roehr became connected with the Montauk Company at about the same time, which was some six weeks prior to the making of the notes; that he had not attended a meeting of the board of directors in that time; that he signed the notes by the direction of the president; that Eurich was present and participated in the negotiations, but that Hoch was not present; that he remained connected with the company about 15 or 20 days thereafter, and that during that time it did not purchase the output of the Eurich Brewery, and that the books of the Montauk Company contained no entry with respect to these notes.

This witness was also permitted to testify, over the objection and exception of counsel for the plaintiff, based on the ground that he had stated that Hoch was not present at the interview, that, when the notes were made, it was understood between Roehr and Eurich that they were to be indorsed back and to be discounted by Roehr at his bank, and that Eurich was to give a statement in writing that they were accommodation paper. He was also permitted to testify, over objection and exception duly made and taken by counsel for plaintiff, that during the time Roehr was president of the Montauk Company certain moneys and merchandise of the Montauk Company were paid and delivered for the benefit of the Eurich Brewery, with which Roehr had been previously connected, for which the Montauk Company was never paid or reimbursed, and that at the time the notes were given the Montauk Company was not indebted to the Eurich Brewery. Rhinehart was also permitted to testify over a similar objection and exception that the Montauk Company was not indebted to the Eurich Brewery at the time the notes were given, but that the latter was indebted to it to the extent of upwards of $3,000. I am of opinion that the learned referee erred in receiving this evidence. It was not shown that the Duluth Company or its representative had any notice or knowledge of these facts. The Duluth Company had a right to rely on the facts as they were presented to its manager. The fair inference from the testimony of the manager of the Duluth Company, which is not controverted, excepting possibly by the testimony of Remsen that he was not present when the notes were signed—if that be deemed a contradiction, and to have been believed by the referee, then there is no evidence of notice to the Duluth Company of the circumstances under which the notes were given—is that he contemplated proceeding against the Eurich Brewery on its notes which his company then held, and that he was led to refrain from taking such step by the assumption of these obliga-

tions by the president of the Montauk Company in behalf of his company and apparently acting for and in its interests, and to avoid any embarrassment with respect to the fulfillment of its contract with the Eurich Brewery, under which it was to receive the entire output of beer of that brewery. If, as found by the referee, these were accommodation notes, they would be void, but the defense of ultra vires is not available to the Montauk Company, because it is not pleaded. Hess v. Sloane, 66 App. Div. 522, 73 N. Y. Supp. 522, affirmed 173 N. Y. 616, 66 N. E. 1110. It is a well-settled rule of law that a corporation can neither make nor indorse commercial paper for accommodation, even though it be paid therefor (Nat. Park Bank v. G. A. M. W. & S. Co., 116 N. Y. 281, 22 N. E. 567, 5 L. R. A. 673), but that rule is not applicable to a case where a corporation assumes an obligation of another for the purpose of protecting its own interests where its property rights or interests might be affected (Hess v. Sloane, supra).

The referee having found that the notes were made by the Montauk Company, it would be difficult to sustain the judgment on his other findings that the execution of the notes by the president and treasurer was not authorized by the by-laws or by a resolution of the board of directors; for if the notes were, as found by the referee, made by the company, full force and effect cannot be given to the finding that the officers who signed them were not authorized by resolution of the board of directors to execute them. Rhinehart testified that he was vice president of the Montauk Company, and was president and general manager prior to the election of Roehr as president; that he never heard of the notes in suit until after Roehr went away; and that no resolution of the board of directors was adopted authorizing the execution of the notes. There were meetings of the board of directors held on the 27th day of July and on the 25th day of September, 1906, but no other between those dates, and the minutes of those meetings contain no resolution authorizing the execution of these notes. The by-laws of the company provided, so far as material, that the treasurer should sign all notes, and should have the right to dispose of the same in the usual course of business, under the control of the board of directors, and "he shall, in connection with the president or vice president, sign all stock certificates, bonds, or other evidence of debts of the corporation, together with all other papers, deeds, or instruments of the corporation," and that the president "shall, with the treasurer," sign all bonds and certificates of stock issued by the corporation, and "shall under the direction of the board have charge of the sales of the products of the corporation, and may perform such other duties as are specifically delegated to him by the board of directors." The by-laws provided that the vice president should sign and execute all contracts in the name of the corporation, and should have and exercise general supervision over the affairs of the corporation. It may be that the president and the treasurer of the Montauk Company were not authorized to execute these notes, but I am of opinion that third parties dealing with the corporation were justified in assuming that they had such authority. Miners' & Merchants' Bank v. Ardsley Hall, 113 App. Div. 195, 99 N. Y. Supp. 98. The trend

of modern decisions with respect to the authority of the officers of business corporations when the interests of third parties dealing with the corporation come in question has been to extend, rather than to restrict, their powers, and the former strict rule announced in Bangs v. Macaroni Co., 15 App. Div. 522, 44 N. Y. Supp. 546, and cases cited, has not been adhered to. The Duluth Company did not have actual notice of the limitation of the powers of the president and the treasurer of the Montauk Company, and is not bound thereby. It does not appear that the Montauk Company's right to take the Eurich Brewery's output of beer as against the Duluth Company was clear.

I am also of the opinion that the learned referee erred in finding that there was no consideration for the execution of these notes. As part of the same transaction the Duluth Company canceled the obligations of the Eurich Brewery, with which the Montauk Company had these intimate business relations, and thereby the Montauk Company was protected against any interference by the Duluth Company with the property of the Eurich Brewery on account of the nonpayment of the notes, and was to that extent protected in its right to obtain the beer of the Eurich Brewery, or, rather, would not be prevented from obtaining such beer by any litigation which might otherwise have been instituted by the Duluth Company.

It follows, therefore, that the judgment should be reversed and a new trial granted before another referee, with costs to appellant to abide the event.

McLAUGHLIN and HOUGHTON, JJ., concur. PATTERSON, P. J., concurs on last ground of Justice LAUGHLIN'S opinion. SCOTT, J., dissents.