In the Matter of the Certificate of Incorporation of the GERMAN JEWISH CHILDREN'S AID, INCORPORATED.

Supreme Court, New York County, June 7, 1934.

*Max J. Kohler,* for the petitioner.

LEVY, J. A certificate for incorporation of a charitable organization to be known as " German Jewish Children's Aid, Incorporated," is submitted to me for approval, pursuant to section 10 of the revised Membership Corporations Law (Laws of 1926, chap. 722). That statute requires the approval of a justice of the Supreme Court. The second paragraph of the proposed certificate of incorporation reads as follows: " The purposes for which it is to be formed are purely charitable, to wit (1) to facilitate the entry of German Jewish children into the United States in cases in which their parents or other relatives desire them to come over with the consent of the United States authorities, (2) to give for such children suitable and proper bonds or undertakings, in such amounts and containing such conditions, as the Secretary of Labor of the United States may prescribe, to the United States and to all States, Territories, counties, towns, municipalities, and districts thereof, holding the United States and all States, Territories, counties, towns, municipalities, and districts thereof, harmless against such German Jewish children, or any of them, becoming public charges, and for schooling and other incidental purposes, such bonds to be given without charge and without indemnity, and are to be delivered in Washington, D. C., to the Secretary of Labor and approved of there by that officer, (3) to aid such children and prevent such children from becoming public charges, and (4) to expend the net funds of the said Corporation, if deemed desirable, for the benefit of the said children, to care for such children by placement in foster homes, either free or at board, or in an institution or otherwise, and (5) for such other matters as may be incidental to the foregoing pur-

poses; all without profit to the Corporation, its members or its officers, and none of its net income may inure in whole or in part to the benefit of any member or private individual."

It is well to notice the strong emphasis placed at the beginning of the recital upon the fact that the purposes are purely *charitable*, and to note the language following subdivision (5) of the purposes, which designedly uses the verbiage of the State and Federal tax laws to insure exemption from taxation of the charity in question. True, a mere statement of charitable purpose is not always necessarily borne out in an analysis of the actual intention of the corporation, and the possibility exists of its true purposes being cloaked in a charitable mantle.

The high sponsorship of this corporation and the personnel of the intended board of directors, on which are a judge of the Court of Appeals, a former justice of the Appellate Division, and a large number of persons well known in philanthropic activities, is a genuine guaranty of the sincerity of purpose. And the written approval on the certificate of incorporation of the State Board of Social Welfare under subdivision 1 of section 11 of the Membership Corporations Law gives assurance that further examination is unnecessary. It is, however, the duty of the justice to whom the approval of a certificate of a membership corporation is submitted, to determine whether the objects and purposes of the proposed corporation are in accord with public policy. (*Matter of Daughters of Israel Orphan Aid Society, Inc.*, 125 Misc. 217.) Worthy as they may be and high-minded as the sponsors behind it are, nevertheless, if public policy should not approve the exercise of the powers for which a grant is sought by a private corporation, it would be a subject of disapproval. (*Matter of Catalonian Nationalist Club*, 112 Misc. 207.) The determining factor of a charitable enterprise is thus described in *Union Pacific Railway Co.* v. *Artist* (60 Fed. 365, 368): " The test which determines whether such an enterprise is charitable or otherwise is its purpose. If its purpose is to make profit, it is not a charitable enterprise."

The purposes of the proposed incorporation are so obviously unselfish and altruistic that no further discussion of this phase of the proposed undertaking would be necessary save for the possible criticism that the relief is limited to German children of Jewish extraction. Except in connection with religious corporations, mild criticism is sometimes indulged in where sectarian objects in charitable enterprises are emphasized. The situation here is entirely free from such criticism if one contemplates the particular disabilities which visit Jewish children in Germany and which condemn them, by virtue of their birth, to a position of social

inferiority and deprive them of educational opportunity equal with others. The discrimination is due to the well-known national socialist " weltanschauung " or world view which so positively dominates present-day Germany. A well-known non-Jewish observer (Dorothy Thompson, in a symposium entitled " Nazism ") has clearly expressed the reasons which make the plight of German Jewish children a greater object of immediate sympathy than that of German non-Jewish children of the so-called prescribed liberal or democratic classes. She says: " Since a fundamental tenet of this World Outlook is the theory that all virtue is biological, and inheres in racial characteristics and racial inheritances, that the German people are Aryans, and that no non-Aryan can, or should, be included in the brotherhood of the new order, the persecution of the Jews is directed at removing them altogether from Germany. In this it differs from the other forms of persecution, in that it regards the victim as — and for no fault of his own — incorrigible. Actually the *physical terror* exercised against the Jews as such has been less active than that exercised against other groups, and for a very good reason: from the other groups what is wanted is submission. But it is the aim to *eliminate* the Jews. * * * therefore the ' cold pogrom ' is undertaken which forces them to leave Germany by closing down one by one opportunities to earn a living or educate their children beyond the elementary grades, and by social ostracism." (Italics in the original.)

The actual misery of these German Jewish children is poignantly described by the noted author, Stefan Zweig, himself a victim of the application of the Nazi racial ideology, in a published address entitled " Their Souls a Mass of Wounds," delivered in London November 30, 1933. It is very likely that the irresistible appeal contained in that address has furnished the immediate motive for the organization of this laudably humane movement. The following statement from that address appears appropriate and leaves its impress on the souls of all lovers of children: " Many of the children who are growing up now in Germany, must, I fear, become embittered, and bitter, infected by the hatred which incomprehensible injustice will arouse in them. It must be our ambition, our duty to see that the new Jewish generation rises superior to the present in strength and ethical feeling, that it should not grow up as a hating people, a people of vengeance, but will be a people of understanding, carrying further our historic mission of being the mediator between all nations, the warrior against all war and all hatred.

" That is why it seems to me important and essential that as many Jewish children as possible should at the present moment

grow up not in Germany where they must be exposed to enmity and contempt all around, but should also learn to know other more friendly parts of the world, so that their natural capacity for affection should find an outlet; that they should either be planted in the native soil of Palestine, or for a time find a home among nations, such as your own, that respect themselves and elevate themselves by the liberty that they grant in matters of religion of every form to every race upon this earth."

I understand that possible technical difficulties due to Federal immigration regulations have been surmounted, so that the corporation may at once begin to function practically. Nothing should, therefore, stand in the way of the approval of the court, and its blessings of the enterprise, save perhaps the question as to the legal propriety of the second of the recited objects. That feature authorizes the proposed corporation to furnish bonds and undertakings, where required in order to effectuate its charitable purposes. In view of the unprecedented character of such a purpose in the certificate of a membership corporation, the court deems it wise to pass upon its propriety in more extended observations than would usually be made on the subject.

The giving of bonds or undertakings is necessary to facilitate the entry of the children proposed to be brought into the United States. Such undertakings given to the Secretary of Labor are a guaranty that the children will not become a public charge. Obviously, there are different forms which these undertakings may assume. Thus, the corporation may secure an individual to provide the proper guaranty in a given case. Such indemnity, of itself, may not be satisfactory to the Secretary of Labor, who may prefer the moral assurance of the organization with its high sponsorship, coupled with financial responsibility. The question will then revert to the right of the corporation to give undertaking and to the legal propriety of including such a power as this in the certificate. It is fundamental that the right of an individual to furnish a guaranty, even for a consideration, is beyond question. It is likewise true that a corporation may guarantee certain obligations, provided such an act is necessary to advance its regular corporate activities. This follows from the general rule that every corporation, unless restrained by law, has the incidental power to make any contract necessary to promote the objects for which it is created. (*Legrand* v. *Manhattan Mercantile Association*, 80 N. Y. 638; *Hess* v. *Sloane*, 66 App. Div. 522; affd., on opinion below, 173 N. Y. 616.) It has the right, even without express authority in the certificate, to give a bond as surety or to execute a guaranty to secure or retain a customer in its own pecuniary interest. (*Fuld* v. *Burr Brewing Co.*,

18 N. Y. Supp. 456; *Koehler & Co.* v. *Reinheimer*, 26 App. Div. 1; *Holm* v. *Claus Lipsius Brewing Co.*, 21 id. 204.) (See, also. *National Park Bank* v. *German-American M. W. & S. Co.*, 116 N. Y. 281.) In *American Surety Co.* v. *14 Canal St., Inc.* (276 Mass. 119), the defense of *ultra vires* was interposed in an action by a surety company to which defendant had given an agreement of indemnity to induce it to execute a surety bond for another corporation, all of whose stock it owned. The court, in overruling the defense, said: " Undoubtedly the main business of a corporation is to be confined to that class of operations which properly appertain to the general purpose for which its charter was granted. But it may also enter into contracts and engage in transactions which are incidental or auxiliary to its main business."

There is no reason why the doctrine of implied powers should not apply to a non-profit corporation as it does to a business corporation. In 6 Fletcher's Cyclopedia of Corporations (§ 2544, at pp. 292, 293) it is said: " Like other corporations, a charitable corporation has, in addition to its express powers, such implied powers as are necessary to carry out those expressly granted (*Dwyer* v. *Leonard*, 100 Conn. 513; *Fowle Memorial Hospital Co.* v. *Nicholson*, 180 N. C. 44). So if it has express power to send poor children residing in any part of a certain city into the country, it may select the individuals to be sent; (otherwise, it could not conduct fresh air excursions at all (*Dwyer* v. *Leonard*, 100 Conn. 513). * * * A charitable corporation may dispense part of its bounty outside the state (*Balch* v. *Shaw*, 174 Mass. 144). It should not illegally use or divert to a wrongful purpose money, funds or property acquired by it."

In order to carry out its main purpose of providing a new temporary asylum for these afflicted children of Germany, it will be necessary for the corporation to provide undertakings. Assuming that it secures such from bonding companies recognized for their responsibility by the Secretary of Labor, or the Superintendent of Insurance, nevertheless it will be compelled to indemnify the bonding companies which write the bonds. To foreclose it from the right of furnishing such indemnity is virtually to make it impossible for the corporation to carry out its very humane purpose. Again, if the Secretary of Labor, relying upon the moral and financial responsibility of the proposed corporation, should accept its undertaking, there is nothing in public policy which would prohibit this. It would not be engaging in the insurance business for hire. Its obligation to see that the children did not become a public charge would be a most solemn one, understood to be such by its sponsors and contributors. If their organization should fail in its sacred

promise, they could not complain if the government enforced the obligation by proceeding against the property of the corporation. The consequences, therefore, of becoming responsible on the indemnity would not be such as might be deemed beyond the contemplation of the members of the corporation.

In examining into the purposes of a corporation we must look at substance and not form. I agree, for example, with the rule in *Bear* v. *Bromley* (18 Q. B. Div. 271 [118 Eng. Reprint, 101]), that a "Mutual Friends' Society," formed to lend money without profit, is a charity, and, therefore, not required to be registered under an English statute applicable to profit corporations only. While I find no pronouncement on the subject in America, I should consider a corporation which is organized to lend money without interest or profit as a corporation organized for benevolent purposes and not to do a banking business. Such a corporation might even accept indorsements or other forms of security from the borrowers against loss of principal. It would nevertheless still be engaged in a charitable enterprise. And so, I should regard the proposed corporation, even though forsooth it furnished a large number of indemnities in the furtherance of its object, without any charge to those for whose benefit they were furnished and without any profit to itself, as engaged in a charitable enterprise and not in the bonding business.

The certificate is approved.