**In the Matter of OLLAG CONSTRUCTION EQUIPMENT CORP.**

**MANUFACTURERS AND TRADERS TRUST COMPANY, Plaintiff-Appellant,**

v.

**Karl GOLDMAN, as Trustee of Ollag Construction Equipment Corp., Bankrupt, Defendant-Respondent.**

**No. BK–73–1068.**

United States District Court, W. D. New York.

Feb. 14, 1978.

William H. Gardner, Hodgson, Russ, Andrews, Woods & Goodyear, Buffalo, N. Y., for plaintiff-appellant.

Karl Goldman, Goldman, Costa & Getman, Buffalo, N. Y., for Trustee in Bankruptcy.

## MEMORANDUM and ORDER

ELFVIN, District Judge.

The Manufacturers and Traders Trust Company ("M & T") appeals from the decision and order issued September 9, 1976 and from the post-judgment order issued September 24, 1976 by the Honorable Beryl E. McGuire, Bankruptcy Judge, which denied its reclamation petition. The decision of the bankruptcy court, as amended, held that section 908 of New York's Business Corporation Law ("the BCL") was the applicable statutory provision which governed the purported granting of a security interest by Ollag Construction Equipment Corporation ("Ollag") and that the statutory requirement of shareholder approval was not complied with thus invalidating the se-

curity agreement under New York law. Having so determined that the security agreement was invalid for failure to obtain shareholder approval, the bankruptcy judge found it unnecessary to determine whether Leopold Gallo, President of Ollag, had authority to execute and deliver the security agreement in question which pledged all of Ollag's assets. The court below further concluded that, even if the execution of the security agreement complied with the requirements of state law, the security interest created thereby constituted a voidable preference under section 60(a)(1) and (b) of the Bankruptcy Act, 11 U.S.C. § 96(a)(1) and (b).

On appeal, M & T contends that section 202(a)(7) of the BCL rather than section 908 as held by the bankruptcy judge, governed and that shareholder approval was not required. M & T further asserts that Leopold Gallo had the authority to sign the security agreement on behalf of the corporation whereby all of Ollag's assets were pledged to secure a guaranty previously given to M & T. In addition, M & T maintains that the bankruptcy judge erroneously concluded that the granting of said security interest was a voidable preference. M & T argues that the trustee in bankruptcy failed to meet his burden of proof with respect to three elements necessary to a finding that a voidable preference had been created. M & T alleges that the proof submitted by the trustee failed to show that Ollag was insolvent at the time of the transfer, that M & T then had reasonable cause to believe that Ollag was insolvent, and that the effect of the transfer was to enable M & T to obtain a greater percentage of its debt than some other creditor of the same class. Furthermore, M & T points out that the issue whether the execution of the security agreement was in furtherance of the corporate purposes of Ollag must be divorced from the issue whether Leopold Gallo had the authority to execute such agreement on behalf of Ollag.

Section 908 of the BCL provides:

"A guarantee may be given by a corporation, *although not in furtherance of its corporate purposes*, when authorized at a meeting of shareholders by vote of the holders of two-thirds of all outstanding shares entitled to vote thereon. If authorized by a like vote, such guarantee may be secured by a mortgage or pledge of, or the creation of a security interest in, all or any part of the corporate property, or any interest therein, wherever situated." (Emphasis added.)

Section 202(a)(7) of the BCL states:

"Each corporation, subject to any limitations provided in this chapter or any other statute of this state or its certificate of incorporation, shall have power *in furtherance of its corporate purposes* : * * * (7) To make contracts, give guarantees and incur liabilities, borrow money at such rates of interest as the corporation may determine, issue its notes, bonds and other obligations, and secure any of its obligations by mortgage or pledge of all or any of its property or any interest therein, wherever situated." (Emphasis added.)

In order to decide which of the above statutory provisions applies, it must be determined whether the granting of the security interest by Ollag to secure its previous guaranty of the debt of Deplan Contracting, Inc. ("Deplan") was in furtherance of Ollag's corporate purposes. To make such determination, a review of the particular facts and circumstances must be undertaken. Such inquiry should focus upon the character and business of the corporation, the relationship between the transaction in question (here the granting of a security interest to secure the debt of the parent corporation) and the business engaged in by the corporation, and whether such corporate transaction is expected, directly or indirectly, to benefit and further such business and purpose.

The Gallo brothers [1] owned and managed a family construction business which involved three manifestly interrelated corpo-

---

**1.** Originally four brothers were involved with the construction business, but sometime prior to 1973 one withdrew to avoid a conflict of interest with a new position he had accepted.

rations. Deplan was the operating company which negotiated and contracted with governmental bodies and outside private parties and performed the construction work contracts. Ollag was the equipment-owning corporation from which Deplan rented the heavy construction equipment needed to perform the said construction projects. Although Ollag did not rent its equipment exclusively to Deplan, uncontroverted testimony adduced at trial revealed that approximately ninety percent of Ollag's rental business was to Deplan.[2] Sheldon Construction, Inc. ("Sheldon") owned the real property and buildings from which Deplan operated.

The Gallo brothers owned all the stock and also were the officers and directors of the three corporations. At some time prior to February 1973, the common stock of Ollag was transferred to Deplan so that Ollag became a wholly owned subsidiary of Deplan.

M & T had been financing Deplan for a number of years and in January 1973 there was an outstanding balance of approximately $200,000 of unpaid principal owed to it under notes signed by Deplan. As security for these loans, M & T held perfected security interests in equipment owned by Deplan and a mortgage on the land and buildings owned by Sheldon. In addition, M & T obtained guaranty agreements from both Ollag and Sheldon with respect to the debt owed by Deplan. Ollag executed its guaranty April 18, 1968, but such was not secured with any property originally and remained unsecured until Leopold Gallo's allegedly valid pledge of Ollag's assets February 2, 1973.

In January 1973, M & T and other creditors of Deplan learned that Deplan was in serious financial difficulty because its bookkeeper had concealed certain accounts payable by failing to enter them on Deplan's books. Deplan's financial situation was discussed at various meetings during that month among representatives of Deplan, M & T and Travelers Indemnity Company ("Travelers"), which had provided certain construction bonds to Deplan and with which Ollag had in such connection signed an indemnification agreement. M & T contends that it was not then aware of this agreement and that such was not mentioned during the discussions.

After the meetings, M & T initially indicated that further financing would not be forthcoming. Subsequently, however, the possibility that a financing plan could be arranged whereby Deplan could be saved from bankruptcy was discussed by representatives of both M & T and Deplan and, in February 1973, Leopold Gallo, also President of Deplan, was requested by Gerald M. Stoddard, Manager of the Lancaster office of M & T, to discuss the situation at the Lancaster bank office. At such meeting, Gallo signed a security agreement whereby Ollag granted a security interest to M & T in all assets owned by Ollag to secure its previously unsecured April 1968 guaranty of the debt of Deplan. Testimony adduced at trial demonstrated that Gallo believed it would have been unwise not to accede to the bank officer's request as he wished to retain M & T's good will during ongoing discussions about possible further financing by M & T to save Deplan from bankruptcy.[3]

2. Leopold Gallo testified during direct examination by William H. Gardner, Esq., counsel for M & T, as follows:

"Q. Now, in that same period, Mr. Gallo, what business did Ollag do? A. It was a rental corporation.
"Q. What did it rent? A. Backhoes and—I don't know exactly the equipment involved, but some equipment.
"Q. It was a construction type equipment? A. Yes, construction equipment.
"Q. Who did it rent to? A. Mostly to Deplan.
"Q. Did it rent to anyone else? A. Well, I am not sure, but I think it may have.

"Q. Can you give us any indication as to the proportion of its business which it did with Deplan? A. Oh, the major portion.
"Q. More than half? A. Oh, yes.
"Q. Would it have been as much as ninety percent? A. I would say it would, yes.
"Q. Is it fair to say, as a matter of fact, that if it rented to anyone else, it was simply an occasional rental? A. Yes, right. That is true."

3. Upon being questioned by Gardner, Gallo testified as follows:

"Q. Do you recall what conversations you had with him at that point? A. Well, it looked

Thereafter, up-to-date financial statements indicated that, even with the additional input of borrowed and investor funds, Deplan would probably be bankrupt in six months. Therefore, instead of jeopardizing the additional monies of new investors, Deplan voluntarily filed a petition in bankruptcy March 20, 1978 under Chapter 11 of the Bankruptcy Act. On May 30, 1973, Travelers as surety on several of Deplan's construction projects and holder of Ollag's guaranty of the indebtedness of Deplan filed an involuntary petition in bankruptcy against Ollag.

The first issue which must be decided on this appeal- is whether the court below correctly concluded that section 908, and not section 202(a)(7), of the BCL governed the execution of the security agreement by Leopold Gallo on February 3, 1973, pledging the assets of Ollag. The answer to this inquiry will hinge upon a determination whether the pledge of Ollag's assets was "in furtherance of its corporate purposes." [4]

In *Chester Airport, Inc. v. Aeroflux Corporation,* 37 Misc.2d 145, 237 N.Y.S.2d 752 (N.Y.Co.S.Ct.1962), *modified per curiam,* 18 A.D.2d 998, 238 N.Y.S.2d 715 (1st Dept. 1963), the court held that a parent corporation's guaranty of a lease entered into by its subsidiary, which was the parent's customer and which shared common officers, directors and employees with the parent, fell within the scope of section 19(a) of the New York Stock Corporation Law, the predecessor to section 202(a)(7), which granted a stock corporation the power to guarantee any monetary obligation "when the guaranty is made in connection with, and incidental to, the exercise by such corporation of its corporate rights, powers, purposes, privileges and franchises". The court emphasized that the close business

---

favorable; that the monies looked good; that the bank was going to be able to pull this thing out.

"Q. And did you sign the document; is that correct? A. Yes.

"Q. Did you understand that you were signing a chattel mortgage or a Security Agreement? A. I can honestly say that all Jerry told me was, he said, 'Before we can, you know, give you the money or proceed with this thing, you have to sign this document.'

"Q. Okay. A. And I signed it.

"Q. Did he hand it to you? A. Yes, he handed it to me and I just signed. I didn't even look at it, I must say, with some degree of reluctance, that I did not look at it.

"Q. Okay. Did you ask him any questions about the document? A. No, I don't think that I was—you know, once he convinced me that the monies were forthcoming and I was—you know—I would have signed anything.

"Q. Did you know what this document was when you signed it? Did you know what a Security Agreement was? A. No. I—all I remember is that Jerry put it in front of me and he said something to the effect that I had to sign it for further consideration—as part of the consideration for the loans and I just signed it and that was it."

In response to questions from Trustee Goldman, Gallo responded as follows:

"Q. I see, But this signing of this document on February 3, 1973, was in the middle of all these negotiations? A. Yes.

"Q. It did not determine or terminate your discussions? A. Oh, no.

"Q. You did not arrive at a fixed program of refinancing or a fixed set of documents for the

purpose of refinancing? A. No. I looked at the document as a prerequisite to borrowing enough money to save the company, to pay all the bills.

"Q. Before you felt that the bank would talk to you? A. Yes."

4. M & T's assertion that the "clearly erroneous" standard for review of findings of facts set forth in Bankruptcy Rule 810 does not control this issue is well taken. The application of a legal standard to facts adduced at trial is not a finding of fact to which such standard applies. *In re Hygrade Envelope Corp.,* 366 F.2d 584, 588 (2d Cir. 1966). Therein, the court recognized that clarity of thought would be promoted if courts would recognize that applying a legal standard to facts reasonably found to exist involves both questions of law and fact. It noted that when a court is called upon to review the legal interpretations of another judicial officer, the scope of review should necessarily be broad in order to ensure that statutory provisions are interpreted in a consistent manner. The court stated: "To be sure, an appellate court must respect findings of the trial judge as to what in fact happened and in addition should give due weight to his superior opportunity to acquire the true feel of the case * * *. But when the issue is his application of a legal standard to facts undisputed or reasonably found, reversal is not limited to results that are 'clearly erroneous'; it is enough that the appellate court should be convinced, as we are here, that the result does not jibe with the applicable rule of law."

and organizational relationship between the corporate guarantor and its subsidiary clearly demonstrated that the guaranty was made to further the guarantor's business and financial interests. The court stated at 237 N.Y.S.2d 755 that:

" * * * the proof shows that Kenyon was a subsidiary of defendant, which owned 51% of its stock; that Kenyon was a supplier of gyros to defendant for many years; that it was a customer of defendant and owed defendant approximately $100,000; that it was interrelated with defendant with respect to common officers, directors and employees, and it was also interrelated with defendant with respect to a proposed merger or consolidation."

The trustee in his post-trial brief sought to distinguish the facts in *Chester Airport* from those in the case at hand by pointing out that *Chester Airport* involved a situation where a parent corporation guaranteed the debt of its subsidiary while in the present case a subsidiary pledged its assets to secure the debt of its parent. The trustee argues that the latter factual situation does not give rise to a finding that such action would be in furtherance of the subsidiary's corporate purposes. However, the trustee neither cites any authority for that proposition nor offers any supportive rationale except to state at page 11 of his post-trial brief that "[a]pparently the rule is not the same in reverse and accordingly it would not seem to have been within the regular course of its business for Ollag as the Subsidiary to guaranty [sic] the obligations of Deplan, the Parent Company". The trustee's contentions are unavailing. Whether the parent guarantees the debts of its subsidiary or the subsidiary guarantees the debt of its parent is not a dispositive factor. The key factors to be examined in reaching a decision on whether such actions are in furtherance of a corporation's purposes are the closeness of business relationship between the corporations, any commonality of shareholders, officers and directors, the reasons for guaranteeing another's debts or for granting a security interest to secure such indebtedness, and the benefi-

cial results expected to be derived therefrom.

The court in *Chester Airport* also noted that at common law a corporation could guarantee the payment of rent and the performance of the terms of a lease agreement of a customer, citing *In re German Jewish Children's Aid,* 151 Misc. 834, 272 N.Y.S. 540 (N.Y.Co.S.Ct.1934). In that case, the court stated at 272 N.Y.S. 545 as a general rule of law that a corporation may guarantee monetary obligations if such action would advance its regular corporate activities and specifically re-affirmed the power of a corporation "to give a bond as surety or to execute a guaranty to secure or retain a customer in its own pecuniary interest".

In *In re B–F Building Corporation,* 284 F.2d 679 (6th Cir. 1960), B–F Building Corporation had guaranteed the payment of indebtedness owed by Baird-Foerst Corporation to certain creditors for merchandise sold and delivered and for periodic advancements of monies in connection with accounts receivable financing. The referee in bankruptcy and the district judge on appeal held that such contract of guaranty was beyond the powers of B–F Building Corporation. In reversing these decisions, the Court of Appeals pointed out that B–F Building Corporation and Baird-Foerst Corporation were closed corporations, that Mr. Baird and Mr. Foerst were President and Vice-President, respectively, of B–F Building Corporation and between them owned all of its outstanding shares of stock, and that they, together with Mr. Baird's wife, sat on its board of directors. In addition, Mr. Baird and Mr. Foerst held the same corporate offices in Baird-Foerst Corporation and were the principal stockholders and directors of that corporation. Furthermore, the court noted that B–F Building Corporation owned a building which at the time of execution of the contract of guaranty was being leased to Baird-Foerst Corporation. The court observed (at page 681) that, in executing the contract of guaranty, B–F Building Corporation "was merely guaranteeing the indebtedness of its tenant

which was the operating company". Such guaranty, it was concluded, was in furtherance of the business and corporate purposes of B–F Building Corporation.

In *Henderson Tire & Rubber Co. v. Gregory,* 16 F.2d 589 (8th Cir. 1926), a manufacturing concern which produced more items than it had been able to sell through past marketing techniques created a subsidiary sales corporation which established and organized various retail sales outlets. In order to finance such retail operation the parent indorsed certain trade acceptances of its newly-formed sales corporation. It was held (at page 595) that the manufacturer's indorsements of the trade acceptances of the retail corporation were in furtherance of, and incidental to, the purpose and business of the manufacturer and that such corporate activity was encompassed by the general principle that a corporation may agree to guarantee the obligations of another corporate entity when reasonably incidental to its authorized business.

In *American Casualty Co. v. Dakota Tractor and Equipment Co.,* 234 F.Supp. 606 (D.N.Dak.1964), plaintiff sought to recover on two indemnity agreements executed by Dakota Tractor and Equipment Co. ("Dakota Tractor"), a family owned equipment corporation, whereby that corporation agreed to indemnify plaintiff against any losses sustained as surety on two road construction contract bonds covering one James Coghlan, a road contractor. After recognizing that a corporation has the power to lend its credit to another by acting as surety or guarantor whenever such action is reasonably necessary to conduct its business, the court concluded that the indemnity contracts agreed to by Dakota Tractor were in furtherance of its corporate purposes because it reasonably expected that such indemnification would result in an increase in Dakota Tractor's business through the sale of equipment and parts to Coghlan and would also enable him to satisfy a debt previously owed to Dakota Tractor.

In *McCarty v. Nostrand Lumber Co.,* 232 App.Div. 63, 248 N.Y.S. 606 (2d Dept.1931), it was held that the execution of a contract of guaranty by Nostrand Lumber Company, Inc. of the notes and mortgage of Long Beach Lumber Company, Inc. was within the guarantor's corporate power. In so holding, the court noted that both lumber corporations were owned or controlled by a Mr. Whitbread and that there was an ongoing business relationship between the two corporations evidenced by a running account between them and the revival of a credit in excess of $133,000 in favor of one corporation against the other.

In *Bacon v. Montauk Brewing Co.,* 130 App.Div. 737, 115 N.Y.S. 617 (1st Dept. 1909), Montauk Brewing Co. ("Montauk") had agreed to purchase all the beer produced by Eurich Brewery ("Eurich"). After Montauk was informed that Eurich was indebted to a third party and would be unable to pay until after it had received payment for the beer sold to Montauk and that such creditor was willing to extend the time for payment if some type of arrangement could be mutually agreed to, Montauk signed accommodation promissory notes so that Eurich's debt could be cancelled. The court found that Montauk assumed the obligation of Eurich to further its own pecuniary interests by preserving the financial integrity of Eurich to ensure the receipt of the supply of beer for which it had contracted. It was held that the general rule of law that a corporation could not make or indorse commercial paper for accommodation was not applicable because Montauk assumed the obligation of Eurich in order to protect its own interests in a situation where its property rights or economic interests might otherwise have been adversely affected.

In *Hess v. W. & J. Sloane,* 66 App.Div. 522, 73 N.Y.S. 313 (1st Dept.1901), defendant had guaranteed a certain obligation of foster Brothers, a partnership which operated a hotel and to which defendant had sold a large amount of carpets and furniture on credit. The court held that a corporation's guaranty of its customer's note to a third party in order to prevent the failure of such customer's business and to enable him to carry on his business so that he would be

able to pay for the items sold to it on credit was an incidental power possessed by the corporate guarantor which was necessary and convenient to further its business purposes.

Although the above-cited cases did not involve the execution of a security agreement whereby corporate assets were pledged as security, but dealt with guarantees, indorsements and accommodation promissory notes, the rationale employed by the jurists therein may be appropriately applied to the instant case.

At the time of the purported execution of the security agreement, Ollag was the wholly owned subsidiary of Deplan and one of three corporations set up by the Gallo brothers through which their construction business operated. The three corporations were structurally and functionally interrelated. The Gallo brothers were the sole stockholders, officers and directors. Deplan was the principal lessee for Ollag's equipment. Ollag, the equipment rental corporation, thus depended upon the corporate health of Deplan, the operating company, to sustain its own corporate viability.[5] At the beginning of 1973, Deplan discovered that it had serious financial problems and that bankruptcy loomed as a distinct possibility. If Deplan fell into bankruptcy, the corporate life of its equipment rental subsidiary would have also been jeopardized. With this situation confronting the Gallo brothers, they attempted to secure additional funds so that their construction business could regain its vitality. An attempt was made to formulate a mutually acceptable financial arrangement which would provide an economically sound foundation on which the construction business could avoid bankruptcy. During these sensitive negotiations, Leopold Gallo executed the security agreement pledging the assets of Ollag as security for the debt of Deplan.

The trustee contends at page 6 of his brief on appeal that Ollag's pledge of its assets to secure the debt of Deplan was not in furtherance of its corporate purposes because the security interest was not given to secure its day-to-day business transactions. The trustee argues that as an equipment rental corporation, Ollag's business purpose did not include the pledge of its assets to secure the debt of another corporation. I am not persuaded to adopt the point of view urged by the trustee.

■ The pledge of Ollag's assets was executed in an attempt to prevent the bankruptcy of its parent corporation and principal customer. If such were accomplished, Ollag would preserve its own viability and benefit financially by maintaining or increasing the volume of its rentals to Deplan. Thus, Ollag was acting to retain a customer and to further its own business interests. In addition, as previously observed, there existed a close business relationship and commonality of shareholders, officers, and directors between the two corporations. Under these circumstances, I conclude that Ollag's pledge of its corporate assets to secure its previous guaranty of the indebtedness of Deplan was in furtherance of its corporate purposes within the meaning of section 202(a)(7) of the BCL and that shareholder approval of such transaction was not required. Therefore, the bankruptcy judge's determination that section 908 of the BCL was the pertinent statutory provision must be reversed. Having made this determination, it is· unnecessary to review the holding of the bankruptcy judge with respect to his conclusion that the requirements of section 908 of the BCL were not satisfied.

The next issue to be addressed is whether Leopold Gallo, as President of Ollag, had the authority to sign the security agreement on behalf of Ollag. In his initial opinion, the bankruptcy judge indicated that he had made a finding that Mr. Gallo did not possess such authority. He stated:

"Certainly the pledging or encumbering of all or substantially all of a corporation's assets to secure the debts of yet another corporation, no matter what the

---

5. The bankruptcy judge in his initial opinion had observed that "Ollag, of course, almost

wholly depended upon Deplan for its continued financial well-being".

relationship between the two corporations, could not be viewed as being among the actual or inherent powers of a single corporate officer."

However, in his amended opinion, the bankruptcy judge explicitly disclaimed making any finding with respect to the authority of Leopold Gallo to pledge the assets of Ollag. Therein, it is stated:

"(d) The Court, having determined that plaintiff's Security Agreement was invalid due to failure to comply with Section 908 of the New York Business Corporation Law finds it unnecessary to determine whether Leopold Gallo had authority of the Board of Directors to execute and deliver on behalf of the Bankrupt the Security Agreement in question."

Because the bankruptcy judge did not make a finding on this issue, I would normally remand the case to him rather than make a determination *de novo* solely upon the record. This course of action would allow the bankruptcy judge an opportunity to reach first a conclusion on the issue of the authority of Leopold Gallo to pledge the assets of Ollag and would permit him to assess the credibility of the witnesses who testified before him.[6] However, the court below alternatively held that, even if Leopold Gallo had the authority to pledge the assets of Ollag, the execution of that security agree-ment was a voidable preference under section 60 of the Bankruptcy Act (11 U.S.C. § 96). If there is substantial evidence in the record as a whole to support this conclusion, then the need for a remand to the bankruptcy court on the issue of the authority of Mr. Gallo to pledge the assets of Ollag would be obviated.

M & T has conceded that all elements of a voidable preference have been established except three.[7] M & T asserts that at the time of execution of the security agreement Ollag was not insolvent, that M & T did not at that time have reasonable cause to believe that Ollag was insolvent, and that enforcement of the lien created pursuant to the security agreement would not enable M & T to obtain a greater percentage of its debt than some other creditor of the same class.

Whether the bankrupt was insolvent at the time of the transfer, whether the creditor had reasonable cause to believe that the debtor was insolvent and whether the transfer would result in such creditor recovering a greater percentage of the debt owed than other creditors in his class are questions of fact. *Kaufman v. Tredway,* 195 U.S. 271, 25 S.Ct. 33, 49 L.Ed. 190 (1904). As such, the scope of review of this court is restricted by Bankruptcy Rule 810. The findings made by the bankruptcy judge on

---

6. Bankruptcy Rule 810 provides:

"Upon an appeal the district court may affirm, modify, or reverse a referee's judgment or order, or remand with instructions for further proceedings. The court shall accept the referee's findings of fact unless they are clearly erroneous, and shall give due regard to the opportunity of the referee to judge of the credibility of the witnesses."

7. Section 60(a)(1) of the Bankruptcy Act, 11 U.S.C. § 96(a)(1), sets forth the elements of a preference:

"A preference is a transfer, as defined in this title, of any of the property of a debtor to or for the benefit of a creditor for or on account of an antecedent debt, made or suffered by such debtor while insolvent and within four months before the filing by or against him of the petition initiating a proceeding under this title, the effect of which transfer will be to enable such creditor to obtain a greater percentage of his debt than some other creditor of the same class."

Subsection (b) of section 60 of the Bankruptcy Act, 11 U.S.C. § 96(b), sets forth an additional element required to be shown by the trustee to avoid the preference:

"Any such preference may be avoided by the trustee if the creditor receiving it or to be benefited thereby or his agent acting with reference thereto has, at the time when the transfer is made, reasonable cause to believe that the debtor is insolvent * * *."

Thus, the elements of a voidable preference are: (1) a transfer, (2) made or suffered by the debtor, (3) of any of his property, (4) for or on account of an antecedent debt, (5) within four months of filing of a petition in bankruptcy, (6) to or for the benefit of a creditor, (7) while the debtor was insolvent, (8) which will enable such creditor to obtain a greater percentage of his debt than some other creditor of the same class, and (9) when such creditor has reasonable cause to believe that the debtor is insolvent at the time of the transfer.

these factual issues must be upheld unless they are clearly erroneous. *Cedar-Comb Materials Co. v. Bumb,* 344 F.2d 256 (9th Cir. 1965). In reviewing the record before me, I am mindful that the trustee in bankruptcy had the burden of proof with respect to each element essential to a finding of a voidable preference. *Cohen v. Sutherland,* 257 F.2d 737 (2d Cir. 1958).

Section 1(19) of the Bankruptcy Act, 11 U.S.C. § 1(19), provides the statutory definition of "insolvent": "A person shall be deemed insolvent within the provisions of this title whenever the aggregate of his property, exclusive of any property which he may have conveyed, transferred, concealed, removed, or permitted to be concealed or removed, with intent to defraud, hinder, or delay his creditors, shall not at a fair valuation be sufficient in amount to pay his debts." Thus, I am constrained to apply a "balance sheet test" to determine whether Ollag was insolvent at the time of the execution of the security agreement. *Syracuse Engineering Co. v. Haight,* 110 F.2d 468 (2d Cir. 1940). In order to conclude that a debtor is insolvent within the meaning of section 60 of the Bankruptcy Act, it must be found that there exists a financial condition wherein liabilities exceed assets. *Farmers Bank of Clinton, Missouri v. Julian,* 383 F.2d 314 (8th Cir.), *cert. denied,* 389 U.S. 1021, 88 S.Ct. 593, 19 L.Ed.2d 662 (1967); *Feldman v. Capitol Pierce Dye Works, Inc.,* 185 F.Supp. 426 (S.D.N.Y.1960). It should be noted that a debtor may be solvent for purposes of determining the existence of a preference even though unable to meet current liabilities so long as at a fair valuation his aggregate assets are sufficient to meet his debts. *Cohen v. Sutherland, supra.*

The bankruptcy judge found that Ollag was insolvent as of February 2, 1973, the date of the execution of the security agreement. The opinion below only refers to two sets of financial figures and presumably they had a substantial influence on his finding of insolvency. After filing its petition in bankruptcy March 20, 1973, Deplan filed its bankruptcy schedules listing assets of $481,245.00 and liabilities totalling $714,-459.03. After Ollag filed its consent to being adjudicated a bankrupt on June 4, 1973, it submitted bankruptcy schedules showing assets equalling $149,292.99 and liabilities of $208,425.00.

Although the trustee has the burden of proving insolvency upon the date of transfer, proof of the exact value of a bankrupt's assets and liabilities at a particular point in time is a difficult and often impossible task. *Mack v. Bank of Lansing,* 396 F.Supp. 935 (W.D.Mich.1975). Because of this, insolvency on the critical date of transfer need not be proved by direct evidence. It is sufficient if circumstantial evidence is introduced from which the fact of insolvency on the date of transfer may be inferred. *In re Entertainment Incorporated,* 375 F.Supp. 390 (E.D.Va.1974). Proof that a debtor was insolvent at a later date and that the financial condition of the bankrupt did not materially alter during the interim period of time is sufficient to satisfy the trustee's burden. *Irving Trust Co. v. Manufacturers' Trust Co.,* 6 F.Supp. 185 (S.D.N.Y.1934). Although the figures contained in bankruptcy schedules are not dispositive of the financial condition of the bankrupt at the time of the transfer, they become highly probative and may be retrojected to such time where there has been little change in the bankrupt's financial condition between the transfer date and the date on which the petition in bankruptcy was filed. *Braunstein v. Massachusetts Bank & Trust Co.,* 443 F.2d 1281 (1st Cir. 1971); *Snider v. England,* 374 F.2d 717 (9th Cir. 1967); *Scott v. Builder Marts of America, Inc.,* 323 F.Supp. 955 (D.S.C.1971).

The record in the present case reveals that subsequent to February 3, 1973 there was little business activity in which Ollag was involved and it is clear that nothing occurred which would have altered its financial picture to a material degree. The figures compiled for the bankruptcy schedules provided sufficient circumstantial evidence from which it could have been inferred that Ollag was insolvent on the date of the transfer.

M & T contends that the asset and liability figures used by the bankruptcy judge do not accurately reflect the financial position of Ollag. As noted earlier, Ollag had guaranteed the $200,000 debt of Deplan. M & T points out that, under the law of the State of New York, a guarantor has a right of subrogation against the principal debtor and a right of contribution against the other guarantors. M & T asserts that, in order to properly calculate Ollag's assets for purposes of the balance sheet test, some value must be attributed to its possible rights of subrogation and contribution. In addition, M & T submits that Ollag's agreement to indemnify Travelers for $274,948.31 in payments made on bonds given to Deplan should not be included as a liability because there was insufficient proof from which a fair valuation could be made of this contingent liability.

■ It is true that rights of subrogation and rights of contribution should be appraised and counted as assets. *Syracuse Engineering Co. v. Haight, supra,* at 576. In his opinion, the bankruptcy judge expressly considered the fair market value figures proferred by M & T in its post-trial brief and rejected them. He concluded that they did not accurately depict the true value of Ollag's assets because such figures did not take into account the financial plight of the three corporations and of the Gallo brothers. The opinion does not explicitly indicate whether a specific value was placed on Ollag's rights of subrogation or of contribution. However, there is no requirement that the bankruptcy judge make such precise calculations. What is required is merely that the rights of subrogation and of contribution be taken into account and not ignored. *Wingert v. President Directors and Co. of Hagerstown Bank,* 41 F.2d 660 (4th Cir. 1930). I am satisfied that the bankruptcy judge did not ignore them. His opinion indicates that he considered the valuation scheme urged by M & T.

Under the facts and circumstances presented in the record, the bankruptcy judge could have properly concluded that a fair valuation of these rights would show

that they were worth very little. The right of subrogation against Deplan could not have been worth much, if anything, when viewed against the fact that Deplan's liabilities exceeded its assets by $233,214.03. In addition, Ollag's right to contribution from its co-guarantors, Sheldon and the individual Gallos and their families, was of doubtful value considering the overall financial picture and the minimal non-exempt assets they possessed.

■ M & T's argument that Ollag's indemnification of any losses Travelers suffers by way of its surety bonds should not be included as a liability is rejected. Although it may be true that such should not be appraised up to the total potential liability, it is undeniable that such contingent liability should be included in assessing Ollag's insolvency and that some value should be attributed to it. Such value would not have been an insignificant amount considering the rather large amount owed to Travelers by Deplan, the desperate financial plight of Deplan, and the close relationship between the two corporations with Ollag being a wholly owned subsidiary.

In any event, the salient fact remains that the bankruptcy schedules relied upon by the bankruptcy judge in his opinion show that Ollag's liability exceeded its assets by $59,132.01, exclusive of its indemnification agreement with Travelers. I see no reason why these figures could not be relied upon to show that Ollag was insolvent on the date of bankruptcy. I am not convinced that the finding of insolvency made by the bankruptcy judge was clearly erroneous.

Whether M & T had reasonable cause to believe that Ollag was insolvent at the time of the transfer depends upon all the facts and circumstances which the record shows to have existed then. It is well settled that to satisfy his burden of proof the trustee must show that M & T had more than a mere suspicion that Ollag was insolvent. *Prisbrey v. Noble,* 505 F.2d 170 (10th Cir. 1974). However, it is equally true that actual knowledge of insolvency is not required to be shown. *C. A. Swanson & Sons*

*Poultry Company v. Wylie,* 237 F.2d 16 (9th Cir. 1956). A creditor may not close his eyes so as to remain ignorant of the debtor's financial condition. *In re Hygrade Envelope Corp., supra.* The trustee need only show knowledge or notice of facts and circumstances which would incite a person of reasonable prudence under similar circumstances to make an inquiry. The creditor—in this case, M & T—is then chargeable with knowledge and notice of all the facts which a reasonably diligent inquiry would have disclosed. *Marks v. Goodyear Rubber Sundries,* 238 F.2d 533 (2d Cir. 1956); *Scott v. Builder Marts of· America, Inc., supra.* Inquiry of the debtor alone is generally insufficient. *In re Hygrade Envelope Corp., supra.*

M & T contended in its post-trial brief and re-asserts now on appeal that at the time of the transfer it had no knowledge of the existence of Ollag's indemnification of Travelers' construction bonds given to Deplan and that the calculations it was relying upon showed that Ollag was solvent. The trustee asserts that Ollag's execution of a security agreement pledging all its assets gave M & T notice that Ollag was insolvent or at least should have placed a duty on M & T to inquire into the financial condition of Ollag from which inquiry it would have discovered the true state of affairs.

The record discloses that M & T was intimately involved in the financial problems of the Gallos. M & T knew that a close relationship existed between Deplan and Ollag.[8] It had financed Deplan for a number of years and both corporations had bank accounts with M & T. When· financial problems beset Deplan, Leopold Gallo approached M & T in an attempt to secure additional financing. Numerous meetings were held at which representatives of M & T and of Travelers were present. When creditors began to hound Leopold Gallo in January 1973 for payment, they were referred to Mr. Stoddard[9] who handled the calls and explained the situation to them. Although it may be true that M & T did not have actual knowledge of Ollag's insolvency at the time of transfer, the record discloses that it had more than a mere suspicion.[10]

---

**8.** M & T's Lancaster Office Manager Stoddard testified thusly:

"Q. What did you understand as to the relationship between these three corporations, Deplan, Ollag, and Sheldon? A. Our borrowings were to Deplan.

"Q. Yes. What did you know their relationships were between themselves? A. That Sheldon, I believe had the property and Ollag had some equipment.

"Q. And all of this was used together in the operation of the construction business at this address? A. Of Deplan.

"Q. Yes. A. Yes, it would be.

"Q. And you took the guarantees of these individuals because they were the owners of the three companies. A. The owners and plus they had the net worth to them."

**9.** Leopold Gallo testified when questioned by Mr. Gardner, M & T's attorney:

"Q. Okay. Now do you recall what conversation you had with Mr. Stoddard at that time? A. Well it was one of many many conversations that I had with him, and we were talking about refinancing and it looked very favorable; as a matter of fact, Jerry Stoddard was taking all my calls from my creditors, it looked so good. He asked me if anybody called me to refer them to him because I was really being swamped * * *.

$*$ $*$ $*$ $*$ $*$ $*$

"Q. Okay. Do you remember any conversation between you and your brothers, or you and your attorney, as to how you should deal with the bank during [the] period when these discussions were going on? A. Well, what happened, as these discussions were going on, we assured the creditors that they were going to be paid and Jerry Stoddard was taking all the calls from all the creditors during all this time. As I said before, I was getting swamped and I just didn't know how to handle it and I kept telling the creditors, 'Well, you are going to get the money, trust me,' and this and that, and then it got to the point where I really was going crazy and I called Jerry Stoddard and he said, 'Well, refer them to me and I will tell them that we are considering refinancing you, you know, considering it' $*$ $*$ $*$."

**10.** With respect to a meeting held in the latter part of January 1973, Mr. Gallo testified as follows:

"Q. Now, at the time of this meeting, did somebody express the amount or value of assets and the extent of liabilities? A. Not in those terms. We knew there was a deficit in those terms and that is all we talked about.

"Q. Was the amount of the deficit mentioned at this meeting. A. Yes. We were talking about a half a million dollars.

$*$ $*$ $*$ $*$ $*$ $*$

"Q. And Mr. Stoddard was at this meeting. A. Yes."

The willingness of Leopold Gallo to pledge all the assets of Ollag at a time when negotiations for refinancing of Deplan were underway certainly waved a flag at M & T that Deplan's financial disease had infected Ollag. *See, In re Kent's, Inc.*, 9 F.Supp. 216 (D.Me.1934).

In addition, Mr. Donald W. Readett, an Assistant Vice President of M & T, had taken notes at the January 29, 1973 meeting between the Gallos and the representatives of M & T. In his minutes, Readett stated "CPA prepared a tentative balance sheet dtd 12/31/72 which reflects an insolvent position". Upon questioning by Trustee Goldman, Readett equivocated as to whether he meant that statement to apply to both Deplan and Ollag.[11] Furthermore, testimony revealed that M & T had a two-fold purpose in requesting Leopold Gallo to sign the security agreement. M & T wanted both to better its creditor status with respect to the already outstanding loans to Deplan as well as to formulate a plan for refinancing.[12] This indicates that M & T was concerned about the economic viability of Deplan, which it knew was the parent corporation of Ollag.[13]

Under these facts and circumstances, a person of reasonable prudence would have been on notice to inquire into the financial condition of both corporations. Such inquiry would have disclosed that Ollag had indemnified Travelers and that it was insolvent. Thus, it cannot be said that the bankruptcy judge's finding that M & T had reasonable cause to believe that Ollag was insolvent is not supported by substantial evidence in the record. His determination is not clearly erroneous.

M & T's final contention can be dealt with expeditiously. Its assertion that enforcement of the lien created by the security agreement would not enable it to receive a greater percentage of its debt than creditors of the same class is frivolous. The obvious effect of such agreement was to transform M & T from an unsecured creditor into a secured creditor. As a secured creditor, M & T would take prior to any distribution to unsecured creditors.

In view of the foregoing, I affirm the holding of the bankruptcy judge that the execution of the security agreement dated February 2, 1973 by Leopold Gallo constituted a voidable preference under section 60 of the Bankruptcy Act. Because of this

11. "Q. Now, is that insolvent position as to Deplan or Ollag or Sheldon or all of them? A. Well, would you give me the exhibit and then I can tell you.
"Q. All right. By that I meant the bottom line here in the lower right-hand corner which shows I believe here, $226,000. The Court: And that line refers to which company? The Witness: This is a consolidated balance sheet. The Court: Including—The Witness: Well, it includes apparently all—
"Q. All three of them? A. Right.
"Q. Now, in your statement, in your notes that you made at that meeting, you didn't say that one of the companies was solvent and some of the others are insolvent. You said, 'CPA prepared a tentative balance sheet dated 12/31/72 which reflects an insolvent position.' A. Well, my understanding was that it was Deplan Corporation that was insolvent. We didn't have that much information available to us on Ollag and besides that, Ollag wasn't a direct borrower.
"Q. Well, you had as much information on that statement about Ollag as you had about Deplan, didn't you? A. I don't remember too much discussion about Ollag's position at that meeting."

12. Mr. Franklyn Schafer, a Zone Lending Officer for M & T, stated in his testimony:
"Q. Now, in arriving at a decision that the M & T would request the security agreement from Ollag and its equipment, was it for the purpose that the bank wanted to be better secured? A. I think in reflecting back at the time, I think our—we were endeavoring to try and perform a couple of things, first of all, I think we wanted to be put in a better secured position, certainly but also I think that we were trying to put together a loan that would enable the company to pull itself out of the problems that it had and I think that was another reason why we initially got it secured."

13. Schafer admitted on the stand that Deplan's bankruptcy would not have surprised him:
"Q. Did you know, Mr. Schafer, in January of 1973 that Deplan Company was considering bankruptcy and might go into bankruptcy? A. I don't know at the time whether I clearly thought it through or not, sir. However, probably it wouldn't have come as any surprise to me."

determination, it is unnecessary to remand the case to him because I found section 202(a)(7) of the Business Corporation Law to be the applicable statutory provision.

So ordered.